THE STATE OF WASHINGTON, *Petitioner*, v. CHARLES EDWARD LESNICK, *Respondent*.

*Henry R. Dunn, Prosecuting Attorney, James E. Warme, Chief Deputy,* and *James P. Billberg* and *Robert H. Falkenstien, Deputies,* for petitioner.

*Barry J. Dahl* (of *Walstead, Mertsching, Husemoen, Donaldson & Barlow*), for respondent.

BRACHTENBACH, J.—The defendant appeals from his conviction of the crime of possession of gambling devices. Defendant sought suppression of certain punchboards and other gambling paraphernalia as being the product of an unlawful search of his vehicle. The Court of Appeals reversed the trial court's admission of those items into evidence but affirmed the trial court's order of destruction of the gambling devices, as will be more fully explored later. *State v. Lesnick,* 10 Wn. App. 281, 518 P.2d 199 (1973). We affirm the Court of Appeals, but do so with one major additional point of emphasis in order to meet contentions which the State presented in its petition for review.

The following facts are essentially adopted from the opinion of the Court of Appeals. The Kelso Police Department received a telephone call advising that there was in the city a described van pulling a trailer, the driver of which was attempting to sell "punchboards" in the city. The caller also supplied a license plate number. The caller remained completely anonymous, refusing to identify himself and not providing any information as to the source of his knowledge.

The police chief and a sergeant participated in a search and soon located the described van and trailer in a private club parking lot. They drove to within a short distance of the subject vehicle, and observed that its license number was similar to that given by the informer, though some numerals were transposed. The officers parked their car on an adjacent city street and remained to observe the vehicle. Shortly thereafter, the van was driven from the parking lot onto the street. The officers followed the vehicle for a block and a half, then pulled it over with siren and lights. Up to

that time, they observed neither traffic violations nor any other indications of criminal activity on the part of the driver.

The driver produced his driver's license and the chief then walked to the front of the van to check the license plate, and observed gambling paraphernalia through the driver's window. Defendant was then placed under arrest for possession of gambling devices pursuant to RCW 9.47.030, repealed Laws of 1971, 1st Ex. Sess., ch. 280, § 23. Defendant's vehicle was towed to the police station and searched pursuant to a warrant. A large number of gambling devices, plus certain merchandise, were seized.

The State makes two main contentions: (1) that discovery of the contraband gambling paraphernalia falls within the "plain view" doctrine and (2) that the initial stop of defendant's automobile was a permissible "investigative detention" within the doctrine of *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

The plain view doctrine comes into play only when the officer "has a right to be in a position to have that view." *State v. Cagle*, 5 Wn. App. 644, 490 P.2d 123 (1971). Hence the determinative issue is whether the police had a right to stop defendant's automobile and, thereby, put themselves in a position to view the contraband.

The United States Supreme Court, and this court, have acknowledged that it is necessary to make a delicate balancing of the interest of society in the enforcement of its laws against the individual's right to protection against unreasonable searches and seizures under the Fourth Amendment. *Terry v. Ohio, supra; Adams v. Williams*, 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972); *State v. Gluck*, 83 Wn.2d 424, 518 P.2d 703 (1974).

As a threshold premise, *Terry* confirms that something short of placing a person under arrest may constitute a seizure within the meaning of the Fourth Amendment. "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he

has 'seized' that person." *Terry v. Ohio, supra* at 16. Indeed, the chief of police here admitted that after defendant was stopped, he was not free to leave until the officers' investigation and interrogation were completed.

The second step in our reasoning is the holding of *Terry* that any intrusion upon this constitutionally protected interest must be evaluated as to the reasonableness of the particular seizure in light of the particular circumstances. The "stop and frisk" in *Terry* was based on the police officers' personal observations of suspicious activities which suggested possible criminal activity and justified further investigation.

■ *Terry* standing alone would not justify the investigative stop in this case since here the police made no personal observations of any activity of the defendant justifying the stop. However, as pointed out in the Court of Appeals opinion, the United States Supreme Court has gone a step further and authorized an investigative stop on information supplied by another person. This is the holding of *Adams v. Williams, supra.* But *Adams* is very explicit in requiring that the informer's tip must demonstrate some indicia of reliability. This harkens back to the objective standard of reasonableness imposed by *Terry.* In the words of the *Adams* opinion:

> Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized.

*Adams v. Williams, supra* at 147. Obviously, we are bound by the holdings in both *Terry* and *Adams.*

Our own case of *State v. Gluck, supra,* is consistent with the approach of the United States Supreme Court since it requires a well-founded suspicion to justify an investigative stop.

The fact that the anonymous tipster accurately described the defendant's vehicle is not such corroboration or indicia of reliability as to make reasonable the officers' action. This

is the direct holding of *Whiteley v. Warden*, 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. Ct. 1031 (1971). Nor is the fact that contraband was discovered after the stop constitutionally sufficient. A seizure is not justified by what a subsequent search discloses. *Henry v. United States*, 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168 (1959).

The Court of Appeals aptly summarized the controlling principle and conclusion:

It is difficult to conceive of a tip more "completely lacking in indicia of reliability" than one provided by a completely anonymous and unidentifiable informer, containing no more than a conclusionary assertion that a certain individual is engaged in criminal activity. While the police may have a duty to investigate tips which sound reasonable, absent circumstances suggesting the informant's reliability, or some corroborative observation which suggests either the presence of criminal activity or that the informer's information was obtained in a reliable fashion, a forcible stop based solely upon such information is not permissible.

*State v. Lesnick, supra* at 285.

To this point our opinion has essentially followed the analysis and rationale of the Court of Appeals. We now emphasize a matter of some importance. The State, in its petition for review, alleges that law enforcement will no longer be able to make even reasonable and limited inquiries into possible criminal conduct based upon the tips of informants. Such is not at all the result of this holding. Both *Terry* and *Adams* emphasize that no single rule can be fashioned to meet every conceivable confrontation between the police and citizen. Evaluating the reasonableness of the police action and the extent of the intrusion, each case must be considered in light of the particular circumstances facing the law enforcement officer. In this case, the suspected crime was a gross misdemeanor. It posed no threat of physical violence or harm to society or the officers. Indeed it involved only an activity which was so openly tolerated in some areas that taxes were collected on

the business of persons such as the defendant. This is quite a different matter from the hypothetical tips involving murder or threatened school bombings which were used by the State in its argument to illustrate the purported result of the holding of the Court of Appeals. While we are obviously not passing upon such matters, we do emphasize that if and when other cases arise they will necessarily be judged in light of their particular facts, which is the very clear, basic premise of *Terry* and *Adams*.

■ On the State's cross-appeal, we adopt the holding and language of the Court of Appeals, *State v. Lesnick, supra* at 285:

The state cross-appeals from the order of the trial court directing the return to defendant of certain merchandise seized along with the gambling devices from his vehicle. The position of the state is that this merchandise could be used as prizes or awards in gambling activities, and thus that it should be destroyed under the authority of former RCW 9.47.110, which provides:

Seizure and disposition of gambling devices. It shall be the duty of all peace officers to search for and seize all tables, slot machines, or other article, machine, device or apparatus of the kind commonly used for gambling, or operated for the winning or losing of money or property, or any representative of either, upon any chance or uncertain or contingent event, and all property useful in the operation or maintenance of a bucket shop, and take the same before a magistrate. If in the judgment of such magistrate any of such articles may be useful as evidence in the trial of any case, he may order the same held for such trial or delivered to the prosecuting attorney; otherwise, he shall order the same to be forthwith destroyed. After the final hearing and disposition of any case in which any of said articles may be held or used as evidence, whether such case result in a conviction or acquittal, the magistrate or judge having jurisdiction of such case shall forthwith order all such articles destroyed.

We agree with defendant that this statute, being penal in nature, should be strictly construed. *State v. Boyer*, 4 Wn. App. 73, 480 P.2d 257 (1971). We are of the view

that the trial court correctly distinguished between gambling devices "per se," clearly within the purview of the statute, and mere merchandise which "could have" been used for prizes. The gambling devices are subject to RCW 9.47.110 and will be destroyed upon the remittitur.

The judgment of the Court of Appeals is affirmed.

FINLEY, ROSELLINI, STAFFORD, and UTTER, JJ., concur.
HAMILTON, J., dissents.

HALE, C.J. (dissenting)—A trial is a quest for the truth. Facts are not truth, but only evidence of it. I would no more suppress the evidence than I would the truth. What are the facts upon which the court suppresses the evidence in this case?

Someone, identity unknown, telephoned the Kelso police station and told the officer on duty that the driver of a van and trailer was attempting to sell punchboards in the city. He gave the police a description of the van and its license plate number, but refused to identify himself or the source of his information.

Chief Thorpe and Sergeant Eby of the Kelso police were in the station when the call came in. Two other officers were sent to one section of the city to look for the van, trailer and punchboards, and Chief Thorpe and Sergeant Eby took another area. They found the described van and trailer in the parking lot of a private club, saw that its license number, except for some transposed numerals, was similar to that reported by the anonymous caller. Parking their car on an adjacent city street, the officers kept the van and trailer under observation and, when shortly thereafter the rig was driven from the parking lot onto the street, the officers followed it in their car. The two officers drove behind it for a block and a half and, using the police siren and flasher lights, signaled the van's driver over to the curb. Nothing that the officers saw up to the moment of stopping the van gave any indication of the commission of any offense, traffic or otherwise.

Now come the critical facts. The chief asked to see the driver's license, and the driver produced it for him. Then, while walking to the front of the van to check its license plate, the chief looked through the driver's window and saw the load of punchboards in it. What the police officer saw through the window is what is suppressed as evidence now.

One of the many strange principles of so-called constitutional law to emerge in the last 15 or 20 years is that a police officer, standing on a public street, cannot look through the windows of an automobile on the public street and give evidence of its contents unless he has received some evidence that the vehicle is being or has been used in the commission of a crime. If the policeman's attention is drawn to the automobile other than by accident, he is held accountable as for some kind of misbehavior or violation of constitutional principles, and should he observe in the automobile such curious things as a submachine gun, a bloody corpse with a wound in the head, a bag of marijuana, or a container holding a substance having the appearance of heroin or other contraband drug, the constitution, it is said, not only blinds the policeman from his view but seals his lips at trial.

Whatever rules the judiciary now purport to lay down concerning the brief detention and inspection of automobiles on the public streets by sworn officers of the law, I find not the remotest connection between such rules and the constitutions. So bizarre are the results of this case that, if one indulges the presumption that every sane man must be presumed to know the law, the defendant himself can readily be suspected of making the anonymous telephone call so as to assure himself either free passage out of town with his contraband if not apprehended, or to a certain acquittal if he was.

The constitutions say:

The right of the people to be secure in their *persons, houses, papers,* and *effects,* against *unreasonable* searches

and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

(Italics mine.) U.S. Const. amend. 4.

No person shall be disturbed in his private affairs, or his home invaded, without authority of law.

Const. art. 1, § 7.

Although we have long since departed the era of strict construction and are squarely committed to the philosophy of liberal construction, the fact remains that our constitutions are written documents and what the courts say about them should have some connection—however remote—with their words and phrases. Even the loosest constructionist cannot rationally ignore that the constitutions do mention searches and seizures in writing. The Fourth Amendment was adopted to secure individuals "in their *persons, houses, papers,* and *effects,* against *unreasonable* searches and seizures." (Italics mine.) It would require a vaporous and untenable construction to find in these charters any reference to the colonial equivalent of an automobile or truck moving or standing upon the public streets. Where the constitution speaks of one's house, *person* and effects, the absence of words and phrases giving protection to colonial transport such as wagons, carriages, horses, harness and saddle bags, while moving or standing upon the roads, streets and highways, must have been intentional. Failure to clothe these chattels with the same immunity is, I think, both conspicuous and noteworthy. If the founders of the constitution had thought that individuals were entitled to a running start out of town with their contraband or evidence of crime, or that the constitutions gave their wagons, carriages, horses, harness and saddle bags some kind of immunity from the sheriffs' or constables' observations, they could readily have written it into the constitution. Instead, they chose the narrower and to me far more sensi-

ble doctrine of treating one's house as his castle but even then allowing all *reasonable* searches and seizures with respect to it.

What has grown up in this country, thus, is not a body of judicial precedent sustaining and applying the Fourth Amendment, but a massive agglomeration of judicial rules for playing what might be called search tag, rules it seems to me in a constant state of flux and ferment and having little or nothing to do with constitutional rights and immunities. Sometimes the police win; frequently they lose. Sometimes the contest deteriorates, so far as the jury's view of the evidence is concerned, into a kind of law-inspired shell game—now they see it, now they don't.

In a plethora of irreconcilable precedent producing the inevitable gross quantum of judicial hair-splitting, the courts seem unable to recognize the almost total lack of identity between one's automobile parked on or moving along a public street, and one's house, person and effects. The legislature, however, to the contrary, has long recognized the difference between the two and enacted many statutes which, while readily applicable to automobiles, could not, under the Fourth Amendment, sensibly be applied to one's house, person and effects. An automobile is—and most anyone will affirm it ought to be—a highly regulated device whose operation upon the public streets is held to be closely identified with the public interest and one which directly affects the public safety and welfare.

As a device subject to intense regulation, an automobile on the public streets and ways should bear little relationship under the law of search and seizure to one's house. This distinction was made clear in *Chambers v. Maroney* 399 U.S. 42, 48, 26 L. Ed. 2d 419, 90 S. Ct. 1975 (1970), *rehearing denied,* 400 U.S. 856, 27 L. Ed. 2d 94, 91 S. Ct. 23 (1970), in commenting, *inter alia,* upon the earlier case of *Carroll v. United States,* 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280, 39 A.L.R. 790 (1925), where it was said that an automobile may be searched without a warrant in circum-

stances that would not justify the search of a house or an office. The conclusion is inescapable, even when probable cause is a requisite, that the standards for probable cause are much more liberal and wider latitude is allowed in the search of a vehicle than in the search of a house or an office. What may be an unreasonable search of a house may be reasonable in the case of a motor car. *State v. Gluck*, 83 Wn.2d 424, 427, 518 P.2d 703 (1974).

For example, one need not be licensed to occupy a house or apartment fronting upon a public street, but he must have a driver's license in his possession "at all times when operating a motor vehicle and shall display the same upon demand to any police officer." RCW 46.20.190. Assuming arguendo, that a police officer cannot, under this statute, stop a motorist solely for the purpose of determining whether he has a valid driver's license, he would, nevertheless, have authority to stop the motorist for any infraction amounting to a misdemeanor committed in the officer's presence or in his view, or upon reasonable grounds that the driver has committed a felony. Any authorized stop of the vehicle, it should be said, authorizes the officer to demand that the operator's license be exhibited.

But that is only the beginning of the regulatory measures for automobiles. We have statutes requiring that motor vehicles themselves must be licensed, and a certificate of license registration authenticated with the owner's signature must be carried in the vehicle at all times and "Any person in charge of such vehicle shall, upon demand of any of the local authorities or of any police officer . . . permit an inspection of such certificate of license registration." RCW 46.16.260. Thus, a search of an illegally parked automobile by police, to inspect its certificate of registration conducted in the absence of its driver, which revealed evidence of a burglary upon which a warrant was obtained for the search of a house was held good in a case pointing out the differences under the constitution between one's house and his automobile. *See State v. Woods*, 3 Wn. App. 420,

475 P.2d 573 (1970). And other valid regulatory measures are in effect pertaining to vehicular registration, capacity, equipment and safety devices.

There is no true constitutional parallel between one's house and his car on the public streets. Where one living in rented premises shall be free from unreasonable searches and seizures, if he drives a borrowed or rented automobile on the public streets he must obtain or someone else must have obtained for it a certificate of ownership. RCW 46.12.010. Aside from building and inspection codes, where the constitutions can be said to deny the state power to demand a license as a condition to living in one's house, no such ban prohibits the licensing of motor vehicles. And while on the subject of regulating motor vehicles, one must mention the inevitable legislation to be enacted providing for the installation of air pollution devices and their inspection—legislation which will be virtually impossible to enforce under the aegis of the instant case. Nor should we overlook the comprehensive legislation providing for the stopping and searching of vehicles without a warrant under the fish and game code. RCW 75.08.170; 75.36.010; 77.12.090. These statutes are already doomed by the precedential effect of the instant opinion.

The police should have won this game of search. Good, sound, cogent evidence like the truth itself should never be suppressed. But even if the rules of the game are to control, they do not, as a matter of law, actually bar the evidence in this case. The court now holds that the police officers had no legal right to be on the public streets in juxtaposition to the defendant's van because they had signaled its driver to stop on the basis of an anonymous tip. Had they momentarily stopped the vehicle without ostensible reason and without pretext, it follows under the instant holding that the prosecution would be in a much stronger position than it now is with the tip. In other words, if the police, while strolling past or driving past the van had looked inside it and seen the contraband, the seizure would have been good,

but having done so in response to an anonymous tip the seizure is held bad. Thus, the anonymous telephone caller rendered a valuable service to the defendant by immunizing his vehicle from all search after delivery of the tip so long as the van thereafter was operated without violation of the traffic code.

The two police officers should not be put under any legal disability by the anonymous call but, to the contrary, as officers of the law sworn to protect the public, I think they should be held duty bound to respond to it. The courts ought not foster nor would I concur in the adoption of a rule that the police are obliged to ignore anonymous telephone calls when an excited voice tells the desk sergeant that very suspicious conduct is observed, or what looks to be a crime has been or is being or is about to be committed and the caller, whether reasonably or unreasonably, is fearful of making his or her identity known. I think it both bad law and bad police procedure for the police to answer that they will not respond to anonymous telephone calls because they can make no inquiries at the scene under pain of having all subsequently obtained evidence suppressed, or being charged with illegal procedures. Police officers, as sworn officers of the law, I think, are bound to investigate all substantial and plausible complaints of criminal activities coming to their attention (see *State v. Twitchell*, 61 Wn.2d 403, 378 P.2d 444 (1963)), except those of the most errant nonsense. While it would be better that every informant identify himself and the source of his information, his refusal to do so, in my opinion, does not relieve the police of their responsibilities to respond to calls for help.

Just what response should the police make to an anonymous telephone call that a bomb has been planted in a school; or that it looks to the caller that someone is being forcibly taken as hostage into an automobile; or that there is some suspicious activity taking place outside or inside a bank or supermarket? Does the initial investigation under-

taken without further cause seal out crucial evidence of crime thereafter obtained?

Thus, in this case, even if it may be discerned in the mass of judicial precedent that the initial stopping of the car had been illegal, the seizure, nevertheless, should be held lawful and the evidence good for two sound reasons: (1) the commission of an offense in the presence of the officer, *i.e.*, possession of gambling paraphernalia within sight and sound of the two police officers, and (2) seizure of contraband while it was in plain view of the officers. As I understand the facts of this case, we are not concerned with whether the officers had probable cause to search the van, but merely with their authority to stop it momentarily as it moved upon the public streets. Once having detained it, they clearly had good and sufficient cause to seize its contraband contents and arrest the driver for possessing it because the incriminating goods lay there in plain sight of the officers and in the defendant driver's immediate presence. And on this point, I think the law is clear and to the point: The momentary stopping and detention of a motor vehicle by police officers, even though not involved in any apparent violation of law, should not be held to constitute an arrest.

From a massive mishmash of legal precedent relating to searches and seizures, there can be located, I think, a few principles which, if straightforwardly stated, may readily be applied by policemen and trial judges and which neither deprive the individual of his freedom from *unreasonable* searches and seizures nor prevent a policeman from doing his sworn duty. First, there is the general principle that an automobile, being movable and a ready device for the commission of and flight from and concealment of a crime, does not have the same standards of constitutional protection as does a house or office. What is probable cause to search and seize an automobile may not rise to the standards of probable cause for the issuance of a warrant to search a house. *Carroll v. United States*, 267 U.S. 132, 69 L. Ed. 543, 45 S.

Ct. 280, 39 A.L.R. 790 (1925); *Chambers v. Maroney*, 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975 (1970); *State v. Glasper*, 84 Wn.2d 17, 523 P.2d 937 (1974).

Next comes the general rule that a mere stopping and momentary detention of an individual or a vehicle upon the public streets by legitimate police officers does not constitute an arrest. This principle is stated and restated in *Wilson v. Porter*, 361 F.2d 412, 414-15 (9th Cir. 1966), as follows:

> While it is clear that at the time appellee's car was pulled over probable cause for an arrest did not exist, it is also clear that not every time an officer sounds his siren or flashes a light to flag down a vehicle has an arrest been made. The initial act of stopping appellee's car was not an arrest. Granting that the constitutional prohibition against unreasonable searches and seizures makes no distinction between informal detention without cause and formal arrest without cause, there is a difference between that "cause" which will justify informal detention short of arrest and the probable cause standard required to justify that kind of custody traditionally denominated an arrest. Our concern here is what degree of cause will justify cursory, informal detention in circumstances which would not justify an arrest, and whether the officers met that standard in the particular circumstances of this case.

(Footnotes omitted.) Again, in *Wilson v. Porter*, at pages 414-15, it was said:

> We conclude that no right of the appellee was violated when the officers stopped the car and that the subsequent seizure of the evidence upon which he was convicted was justified as pursuant to a lawful arrest.

and

> We take it as settled that there is nothing ipso facto unconstitutional in the brief detention of citizens under circumstances not justifying an arrest, for purposes of limited inquiry in the course of routine police investigations. Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); Busby v. United States, 296 F.2d 328 (9th Cir. 1961). A line between reasonable deten-

tion for routine investigation and detention which could be characterized as capricious and arbitrary cannot neatly be drawn. But due regard for the practical necessities of effective law enforcement requires that the validity of brief, informal detention be recognized whenever it appears from the totality of the circumstances that the detaining officers could have had reasonable grounds for their action. A founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing.

and approved in *United States v. Brown*, 436 F.2d 702 (9th Cir. 1970).

In *United States v. Bonanno*, 180 F. Supp. 71 (S.D.N.Y. 1960), it was said:

While the Fourth Amendment may be construed as encompassing "seizure" of an individual, it cannot be contended that every detention of an individual is such a "seizure". If that were the case, police investigation would be dealt a crippling blow, by imposing a radical sanction unnecessary for the protection of a free citizenry. Under such a theory, a policeman could not stop and question a person standing next to a bloody corpse. If he did so, before having probable cause to believe that he had committed the crime, and then released him, and subsequently decided on the basis of further checking into the individual's activities that he was likely to be the murderer, the policeman could not testify to the presence of the suspect in the vicinity of the victim because it would be testimony about matters learned upon an "illegal arrest".

(Footnotes omitted.) and,

It is clear, that the mere stoppage of a car by a police officer is not such an illegal act that would taint all evidence stemming therefrom.

*United States v. Bonanno, supra* at 78, 80.

If "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest" as was said in *Terry v. Ohio*, 392 U.S. 1, 22, 20 L. Ed. 2d 889, 88 S. Ct. 1868

(1968), and as stated in *Adams v. Williams*, 407 U.S. 143, 146, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972), "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time," and if the so-called stop-and-frisk statutes are not repugnant to the Fourth Amendment when not oppressively applied, then it follows that the brief stopping of a vehicle moving upon the public streets even without probable cause to believe its occupants have committed, are committing, or are fleeing from the scene of a crime, likewise does not violate the Fourth Amendment prohibition against unreasonable search and seizure.

This court addressed itself to the very question of whether the momentary stopping of a motor vehicle moving upon the public streets violates the rules against unreasonable searches and seizures in *State v. Gluck*, 83 Wn.2d 424, 426, 518 P.2d 703 (1974), where we said:

Defendant first challenges the legal justification for the initial stop by the officers. The stopping of vehicles for traffic or general investigation has been specifically held to be noncustodial in nature. *Lowe v. United States*, 407 F.2d 1391 (9th Cir. 1969); *Jennings v. United States*, 391 F.2d 512 (5th Cir. 1968). It has also been held that traffic enforcement officers may stop motorists for routine checks, and such stopping does not amount to an arrest or unlawful stopping. *United States v. Bonanno*, 180 F. Supp. 71 (S.D.N.Y. 1960), *rev'd on other grounds sub nom., United States v. Bufalino*, 285 F.2d 408 (2d Cir. 1960); *McCarthy v. United States*, 264 F.2d 473 (8th Cir. 1959); *Smith v. United States*, 264 F.2d 469 (8th Cir. 1959). It follows, therefore, that where officers entertain a well-founded suspicion not amounting to probable cause, they may stop the suspected person, identify themselves and require the suspect to identify himself and explain his activity without being adjudged to have made a formal arrest. *State v. Rankin*, 477 S.W.2d 72 (Mo. 1972); *United States v. Bonanno, supra* at 80.

The massive quantum of judicial precedent relating to

search and seizure, much of it conflicting and irreconcilable, should be returned to its earlier established constitutional line of departure in accordance with the observation made in *Elkins v. United States*, 364 U.S. 206, 222, 4 L. Ed. 2d 1669, 80 S. Ct. 1437 (1960), and repeated in *Terry v. Ohio, supra*, that "what the Constitution forbids is not all searches and seizures but unreasonable searches and seizures." Thus, *Whiteley v. Warden*, 401 U.S. 560, 567, 28 L. Ed. 2d 306, 91 S. Ct. 1031 (1971), relied upon by the court as authority for suppressing this evidence, I think inapposite. That case concerned the question of whether information given by an anonymous tipster describing the defendant's vehicle had sufficient evidence of reliability to support the issuance *of an arrest warrant.* But that court decision does say that where the

initial impetus for an arrest is an informer's tip, information gathered by the arresting officers can be used to sustain a finding of probable cause for an arrest that could not adequately be supported by the tip alone. *Draper* v. *United States*, 358 U. S. 307 (1959). See *Spinelli* v. *United States*, 393 U. S. 410 (1969). But the additional information acquired by the arresting officers must in some senses be corroborative of the informer's tip that the arrestees committed the felony or, as in *Draper* itself, were in the process of committing the felony.

That statement of principle fills the bill here. The Kelso police, acting under an anonymous tip, which proved to be partly corroborated by the appearance and license number of defendant's vehicle, did no more than briefly detain the vehicle. At that point, it was not an arrest. Then, while standing where police officers not only have a right, but are frequently under a duty to be, *i.e.*, on the public streets, with their own eyes they saw the defendant in perpetration of a gross misdemeanor, *i.e.*, in knowing possession of illegal gambling paraphernalia.

This brings the case squarely, I think, under the principle stated in *Wilson v. Porter, supra* at 414, that "no right of the appellee was violated when the officers stopped the car

and that the subsequent seizure of the evidence upon which he was convicted was justified as pursuant to a lawful arrest."

The mere stopping of a car by a police officer, in the absence of evidence of a systematic scheme to harass, hinder or annoy the driver or passenger, should not, I think, be deemed such an illegal act so as to taint all evidence stemming from it. The stopping of a vehicle upon the public streets is a noncustodial detention. *See United States v. Bonanno, supra,* and *State v. Gluck, supra.*

This brings us to the application of the commonsense, plain-view rule. Since the police officers were on the public streets where their duty could be said to take them, they were under another duty to prevent the commission of any crimes taking place in their presence or to seize any evidence of crime in plain view. *State v. Twitchell,* 61 Wn.2d 403, 378 P.2d 444 (1963). That, of course, is not only a principle of constitutional law but has the glorifying quality of commonsense, a characteristic frequently wanting in latter-day dissertations on the constitutions.

We should, therefore, adhere to our holding in *State v. Martin,* 73 Wn.2d 616, 621, 440 P.2d 429 (1968), that:

> No search under the constitutional interdiction takes place when items having evidentiary value are outside a building and in plain view, nor if they are in plain sight inside a building to which access has been lawfully gained. *See State v. LaPierre,* 71 Wn.2d 385, 428 P.2d 579 (1967), and cases cited therein. *See also* 47 Am. Jur., *Search and Seizure* § 20 (1943).

and as we again said in *State v. Regan,* 76 Wn.2d 331, 336, 457 P.2d 1016 (1969):

> A police officer is not required to ignore items of possible evidentiary value which are in plain sight. As stated in *Harris v. United States,* 390 U.S. 234, 236, 19 L. Ed. 2d 1067, 88 S. Ct. 992 (1968) (per curiam):
>> It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence. *Ker v. California,* 374 U.S. 23,

42-43 [10 L. Ed. 2d 726, 83 S. Ct. 1623] (1963); *United States v. Lee*, 274 U.S. 559 [71 L. Ed. 1202, 47 S. Ct. 746] (1927); *Hester v. United States*, 265 U.S. 57 [68 L. Ed. 898, 44 S. Ct. 445] (1924).
See also *State v. Poe*, 74 Wn.2d 425, 445 P.2d 196 (1968); *State v. Sullivan*, 65 Wn.2d 47, 395 P.2d 745 (1964); *State v. Brooks*, 57 Wn.2d 422, 357 P.2d 735 (1960).

Thus, a police officer not only is not required to ignore items of possible evidentiary value which are in plain view (*State v. Glasper, supra*), but he may seize without a warrant any objects within his plain view that he has reasonable cause to believe are contraband. *State v. Day*, 7 Wn. App. 965, 503 P.2d 1098 (1972).

I would, accordingly, reverse the Court of Appeals and affirm the judgment of the Superior Court.

HUNTER and WRIGHT, JJ., concur with HALE, C.J.

Petition for rehearing denied February 20, 1975.

[No. 43203.   En Banc.   January 7, 1975.]