IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31319-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RYAN WARD, | ) | OPINION PUBLISHED IN PART |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Ryan Ward raises procedural and substantive errors to the trial court's denial of his motion to suppress evidence. He complains that the findings of fact and conclusions of law entered in response to the motion were signed by a judge other than the judge that heard the motion. He also claims that a law enforcement officer, who searched his pants, lacked a reasonable articulable suspicion to search and that the officer exceeded the scope of a protective frisk. The denial of the motion to suppress led to a conviction, on stipulated facts, of possession of a controlled substance.

We hold that, because Ward prepared the findings of fact signed by the substitute judge and Ward did not object to the signature, there was no error in a substitute judge signing the findings. We also hold that the law enforcement officer had reasonable articulable suspicion to search Ward's person and the search did not exceed the permissible scope. Thus, we affirm Ryan Ward's conviction.

FACTS

On May 26, 2012, at about 4:44 p.m., Eric Whitemarsh and an unnamed Pasco Jack in the Box employee called police to report a fight developing between three to four males inside the restaurant. Each caller provided dispatch a phone number and neither refused to be identified. Officer Ismael Cano of the Pasco Police Department responded. Police dispatch informed Officer Cano, while he was in route, that the altercation had turned "physical." Report of Proceedings (RP) at 6. Dispatch reported pushing, but no weapons. Based upon information provided, Cano concluded that the crimes of assault or disorderly conduct had possibly occurred.

As Officer Ismael Cano arrived at Jack in the Box, dispatch radioed that some of the males involved in the fight were leaving the restaurant in a gray Maxima and others in a black BMW. Officer Cano saw a black BMW exit Jack in the Box's parking lot. The BMW, driven by Ryan Ward, turned right. Cano turned on his patrol car's emergency lights. The BMW pulled to the side of the street.

Officer Ismael Cano stopped the BMW, because he believed the car's occupant was involved in the altercation at Jack in the Box. Cano did not observe any traffic violation. Officer Cano did not know if the driver of the car, Ryan Ward, was a victim, offender, or both. Cano knew that more than one person reported the altercation, but did not know the identity of who called.

During a suppression hearing, Ismael Cano testified:

2

Q. And prior to you stopping Mr. Ward did you confirm the altercation with any of the witnesses or any of the reporting callers?
A. No, I hadn't spoken to anybody.
Q. And you had the ability to follow Mr. Ward before initiating the stop until that was confirmed, correct?
A. No, I saw him leaving at the time I was arriving. I was arriving when dispatch had notified some people involved were leaving, and they gave a description of the vehicles, and I happened to be arriving at the time. And so the description of one of the vehicles leaving, and so that's why I ended up following him and stopping him.

RP at 19. Cano admitted that he relied entirely on information from dispatch to stop the BMW.

Officer Ismael Cano approached the car and spoke to its driver, who identified himself as Ryan Ward. Ward "started to explain everything from the beginning," and he stated he pulled out pepper spray during the altercation. RP at 9. Officer Cano testified:

As [Ward] was telling me what happened, he mentioned something about a pepper spray bottle, and tried to reach underneath the seat. I asked him not to reach underneath the seat but keep his hands up where I can see them. And then he attempted to do it again the second time, so at that point I decided to pull him out of the vehicle and pat him down for weapons for my safety.

. . . .

Up to this point I knew there was an altercation. There could be weapons involved. Also I have been involved in lot of situations where people have weapons underneath the seat such as guns.

RP at 9. Cano asked Ward to step out of his vehicle and place his hands on his head, so Cano could frisk him for weapons. Ward complied.

Prior to the frisk, Ismael Cano asked Ryan Ward if he had any weapons. Ward responded that he had pepper spray and a knife, and that both were under the front seat of

3

his car. Officer Cano began to pat the outside of Ward's clothes. Ward tried to reach down. Cano reminded Ward to keep his hands on his head. Cano felt a hard object in Ward's front left pants pocket. The object felt similar in size to a pocket knife, but wrapped in paper towels.

Ismael Cano had concern that the hard object might be a weapon, so he removed the object from Ryan Ward's pocket. As Cano removed the object, he grabbed, in addition, a small clear bag containing methamphetamine. Cano unwrapped the object to discover a glass pipe.

Another officer arrived at the scene and the additional officer stated he had reason to arrest Ryan Ward for assaulting someone with pepper spray during the altercation at Jack in the Box. Officer Cano arrested Ward for assault and possession of drug paraphernalia. Incident to this arrest, Cano again searched Ward. Cano found another baggie containing a "crystal-like substance" and a screw driver. RP at 15.

## PROCEDURE

On May 31, 2012, the State charged Ryan Ward, in Franklin County Superior Court, with unlawful possession of a controlled substance in violation of former RCW 69.50.4013 (2003), a class C felony. On November 1, 2012, Ward moved, under CrR 3.6, to suppress the seized methamphetamine and drug paraphernalia on two grounds. First, Officer Ismael Cano lacked reasonable articulable suspicion to pull Ward over. Second, Cano exceeded the scope of a protective frisk when he removed the pipe from

4

Ward's pocket. The Honorable Craig J. Matheson heard arguments on the motion November 13, 2012. On November 27, 2012, the trial court denied Ward's motion to suppress.

On November 27, Franklin County Superior Court Judge Matheson issued the following oral ruling:

> THE COURT: I have had a chance to read the cited cases and the additional memorandum and the documents that were handed up last week in detail. The rule that I think applies here is the totality of the circumstances rule. The Court is free to apply the concepts of *Aguilar* [*v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964)], *Spinelli* [*v. U.S.*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969)] on a confidential informant. And but really the Court has to make a determination of the indicia of reliability of the information given to the police.
>
> As I read the cases, the information can be entirely based on information from an informant, if the Court finds that to be reliable.
>
> This case is not your typical drug case where the police are given information and then go and investigate. This case arose out of a report to the police to police dispatch of an ongoing altercation and argument. And there was more than one report to the police. And it was a real-time report in the sense that these people were reporting their present-sense impression about what was going on, and it was an urgent situation.
>
> I believe from how I heard the evidence—the police reports are there in the file as well—that the report was originally made not to investigate the crime but to prevent the violence. So there's not a strong motivation there to fabricate by the informants. Just the opposite. They're apparently citizens making a call to the police to come and interrupt an ongoing dispute. Then there was a subsequent call made reporting that it had gone from verbal to physical, and then there was a call to dispatch and sequence reporting that the parties had jumped in cars and were leaving.
>
> The location of the fast-food restaurant was confirmed by the officer as the car was leaving. So there's confirming facts there. And also it was confirmed or corroborated that it was the same type of car description and driven by a male.

So I think there's indicia of reliability here to support the articulable facts. There's indicia of reliability on the informants, and the facts are confirmed by the officer arriving while this incident is still taking place. Also the cases seem to indicate that it's just that type of situation where there's allegations of violence that assert urgency and a relaxation of the level of proof in the opportunity for the officer to verify the facts is less in a situation where you have violence going on at the very same time.

So this is a reasonable stop and reasonable detention. It's within the *Terry* stop exclusion. [*Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)]. I find that there's indicia of reliability confirmed by the officers. Some of the basic facts were confirmed, quite a few of them under the circumstance, because he happened to arrive as people were doing what the informant was describing at the very same time. So I think this is a good stop and therefore will deny the motion to suppress.

[PROSECUTION]: Your Honor, the other issue was the patdown or frisk.

THE COURT: The [pat down] was consistent with the cases. There was an allegation of an assault and a real reason to search for a weapon. There was as I remember, make sure I don't confuse my cases here, there was in a search he had a weapon in the car. So we have an allegation of an assault immediately prior to this incident followed by the acknowledgement of the weapon. I think a patdown was appropriate, and when he hit something hard that it was reasonable to extract that.

[PROSECUTION]: And that's something hard in the shape of something that he compared to perhaps a pocket knife.

THE COURT: Yeah, well, this glass pipe. So eventually we know. That's consistent with a pocket knife.

So the motion to suppress is denied. It's a good motion. I think on the face of it, it looked pretty strong, but as I read the cases and looked at the actual facts and circumstances taken as a whole, I think it supports a lawful search. Motion to suppress denied.

[DEFENSE COUNSEL]: Your Honor, is part of your findings then that totality of the circumstances or *Aguilar Spinelli* does not need to apply?

THE COURT: Doesn't have to apply in this situation. Court could apply it, but there are other indicia of reliability. And this is not evidence to support a search warrant, which is an entirely different animal than evidence necessary to stop, the detention. And there's clearly evidence that a crime was going on and that this person was leaving the

6

scene. I don't think it's clear whether he was the assailant or the victim, but I don't think it matters. I think you can stop the victim, witness, or the assailant equally in that situation in order to make investigatory stop. Not too much different than the type of evidence necessary to do a search.

[DEFENSE COUNSEL]: And also to clarify your findings, your Honor, just in case Mr. Ward wants to appeal. On the *Randall* [*State v. Randall*, 73 Wn. App. 225, 868, P.2d 207 (1994)] case it distinguished "*Lesnig*" [*State v. Lesnick*, 84 Wn.2d 940, 530 P.2d 243 (1975)] as being a gross misdemeanor and that the Court of Appeals—or the Supreme Court recognized that the totality still worked, but there had to be corroboration under *Aguilar Spinelli* because that crime was a gross misdemeanor being not a violent crime such as the one cited in *Randall*, which was an armed robbery, which gave the officers permission to go into it because it was something that was urgent and there was going to be more crime committed or it was dangerous to the community, excuse me. And how they distinguish that from *Lesnig*. So do you have a finding that we can indicate—

THE COURT: I will say this is an urgent situation with an allegation and reports of violent crime taking place at the time. I think that's crucial. I would say that the reason that this citizen complaint has indicia of reliability is very similar to an excited utterance or present-sense impression in terms of admissibility of evidence, and I think both those things are present. Plus you have the real-time confirmation of the car moving out of the restaurant that was just reported. And this was arguably stopping a crime immediately after it happened, or at least investigating it. So I think there's enough there to say, "Hey, hold on while we get your name and investigate this thing." That's different than getting a search warrant.

So I don't think that *Aguilar Spinelli* really applies. I think the idea of *Aguilar Spinelli*, that is evaluating the reliability of the witness, that identified informant, could apply, but I don't think it does in this situation. So I'd choose not to do it, not to apply it.

Frankly I think that Spokane case is, you know, they're applying the same rules, and I guess reasonable minds could differ, but it might have gone the other way on the Spokane case as well. It'd [sic] enough there, but we'll see. That's why they have a Court of Appeals.

[DEFENSE COUNSEL]: And just to make sure, the dispatch was part of the record that you reviewed so that—

7

THE COURT: Yes, it was, and it identified a second informant. I think that the fact that there are multiple informants giving the same basic information also lends credibility to the information coming to the officer. Very interesting case, because I hadn't really worked through that issue before.

RP at 40-44.

On December 4, 2012, Judge Craig Matheson conducted a trial based upon stipulated facts. Ryan Ward and the State stipulated:

1. On May 26, 2012. Officer Ismael Cano stopped a vehicle driven by [Ward]. [He] was detained and frisked for weapons.
2. During the frisk and search incident to arrest, Officer Cano located two plastic bags in his pants pockets which contained a crystalline substance which field tested positive for methamphetamine.
3. The crystalline substance was sent to the Washington State Patrol Crime Lab, examined by a forensic chemist and found to be Methamphetamine, a controlled substance.

Clerk's Papers (CP) at 57. On these facts, the court found Ryan Ward guilty of possession of a controlled substance. That same day, December 4, the trial court entered findings of fact and conclusions of law for the trial.

One week later, on December 11, 2012, the court sentenced Ryan Ward to 30 days incarceration, ordered 12 months' community custody, and imposed $1,400 in legal financial obligations. Both Ward and the State then proposed findings and conclusions for Ward's suppression hearing. Judge Matheson stated, "Why don't I just read them over and sign one of them. It's kind of hard to do on the bench." RP at 53-54.

For reasons unknown, Franklin County Superior Court Judge Cameron Mitchell,

instead of Judge Craig Matheson, signed Ward's proposed finding and conclusions, dated

December 11, 2012. Next to his signature Judge Mitchell wrote, "for CJM," the initials

for Judge Craig Jay Matheson. CP at 7. Ryan Ward did not object, until this appeal, to

Judge Mitchell's signature on the findings of fact. Judge Matheson has since retired from

the bench.

## LAW AND ANALYSIS

### *Signature of Judge*

Ryan Ward contends that Judge Cameron Mitchell cannot sign written findings

and conclusions on behalf of Judge Craig Matheson, citing RCW 2.28.030(2) and *State v.*

*Bryant*, 65 Wn. App. 547, 549, 829 P.2d 209 (1992). RCW 2.28.030 provides:

> A judicial officer is a person authorized to act as a judge in a court of
> justice. Such officer shall not act as such in a court of which he or she is a
> member in any of the following cases:
> . . . .
> (2) When he or she was not present and sitting as a member of the
> court at the hearing of a matter submitted for its decision.

Judge Mitchell was not present and did not sit as a member of the court for Ward's

suppression hearing.

Generally, a successor judge lacks authority to enter findings of fact on the basis

of testimony heard by a predecessor judge. *DGHI, Enters. v. Pacific Cities, Inc.*, 137

Wn.2d 933, 977 P.2d 1231 (1999); *Svarz v. Dunlap*, 149 Wash. 663, 665-66, 271 P. 893

(1928); *In re Marriage of Crosetto*, 101 Wn. App. 89, 95, 1 P.3d 1180 (2000); *Tacoma*

*Recycling, Inc. v. Capital Material Handling Co.*, 42 Wn. App. 439, 441-42, 711 P.2d 388 (1985); *In re Welfare of Woods*, 20 Wn. App. 515, 517, 581 P.2d 587 (1978); *Wold v. Wold*, 7 Wn. App. 872, 877, 503 P.2d 118 (1972). Case law and court rules set forth the rule that a successor judge only has the authority to do acts which do not require finding facts. *Crosetto*, 101 Wn. App. at 96. Only the judge who has heard evidence has the authority to find facts. *Crosetto*, 101 Wn. App. at 96; *State v. Bryant*, 65 Wn. App. at 550. Nevertheless, the parties may agree to allow a successor judge to make findings of fact based upon the evidence in the record. *Crosetto*, 101 Wn. App. at 96.

We find two Washington decisions that give us contrary directions as to how to resolve this appeal: *State v. Bryant*, 65 Wn. App. 547 and *In re Marriage of Crosetto*, 101 Wn. App. 89. We discuss the two cases before deciding which one to follow.

In *Bryant*, Alexander Bryant pled guilty to two counts of theft. The juvenile disposition hearing was held, before Judge Terrence Carroll, on August 12, 1991. Judge Carroll found a manifest injustice and imposed an exceptional commitment of 21 to 28 weeks. At the end of his oral decision, Judge Carroll directed the State to prepare written findings consistent with his oral decision. Carroll thereafter retired. On December 2, 1991, findings of fact and conclusions of law in support of the disposition were signed by Superior Court Commissioner Maurice Epstein. Alexander Bryant appealed the disposition on the ground that the facts did not support a manifest injustice finding.

10

Bryant also moved to strike the findings and conclusions on the ground that they were not signed by Judge Carroll.

On appeal, the *Bryant* court addressed whether the findings of fact and conclusions of law on the manifest injustice disposition must be stricken because they were signed by a judge other than the disposition judge. There was no indication in the record as to the procedure used by Commissioner Epstein, *i.e.*, whether he reviewed the evidence presented at the disposition hearing or Judge Carroll's oral decision, or whether he merely signed the findings and conclusions as presented by the State. This court ruled, nonetheless, that Commissioner Epstein was without authority to sign the findings and conclusions under any procedure. The decision does not disclose whether Bryant agreed to the form of the findings, agreed to someone other than Judge Carroll signing the findings, or even was given notice of presentment.

In *Marriage of Crosetto*, the Court of Appeals affirmed a substitute trial judge's findings of fact on remand of a divorce suit based upon evidence from the first trial conducted by a first judge. While the case was first on appeal, the original judge retired, and the parties agreed to allow a successor judge to make the necessary determinations based upon the record from the first trial. The successor judge determined that he could render findings without engaging in credibility determinations. After agreeing to the procedure, Laurel Crosetto appealed from the successor judge's findings, arguing that she was entitled to a new trial and that the trial court abused its discretion in making its

11

findings. This court disagreed. The court observed that no Washington law prohibited the parties from agreeing to a substitute judge entering findings.

We do not know why Judge Cameron Mitchell signed the findings of fact or if Ryan Ward knew in advance that Judge Mitchell, not Judge Craig Matheson, would sign the findings. Nevertheless, Ryan Ward's counsel presented the findings to the court and would have received a copy after Judge Mitchell's signature. Judge Mitchell signed Ward's proposed findings, so Ward agreed to the form of the findings as being consistent with Judge Matheson's ruling. If Ward did not agree to the signature of Judge Mitchell, his counsel could have immediately remedied the anomaly by presenting the findings of fact anew to Judge Craig Matheson, rather than waiting to complain on appeal. By failing to object with knowledge of the irregularity, Ward agreed to the signature of Judge Mitchell. Therefore, we decide to follow *Marriage of Crosetto* rather than *State v. Bryant*.

The facts in our appeal are distinct from the facts in *Crosetto*, but militate more in favor of approving the findings of fact signed by a substitute judge. Judge Cameron Mitchell signed the findings of fact and conclusions prepared by Ryan Ward. The findings follow the extensive oral ruling issued earlier by Judge Matheson. Judge Mitchell in fact noted that he was signing on behalf of the hearing judge, Judge Matheson. Ryan Ward is not harmed by a substitute judge signing findings that his attorney prepared based upon another judge's ruling. Therefore, we hold that a substitute

judge may sign findings of fact and conclusions of law based upon another judge's ruling, when the parties do not object, after knowledge of the signature by the substitute judge.

A purpose behind RCW 2.28.030 is to preclude one judge from rendering a finding of fact based on evidence heard by another trier of fact. *State v. Sims*, 67 Wn. App. 50, 59, 834 P.2d 78 (1992); *State v. Olson*, 47 Wn. App. 514, 519, 735 P.2d 1362 (1987). Judge Mitchell did not render any decision on his own. He only engaged in a ministerial act by signing findings of fact previously announced by Judge Matheson. The signed findings were consistent with Judge Matheson's oral findings.

Our ruling is consistent with the rule that one must object to any error to preserve the error for an appeal. It is well settled that we will not review an issue, theory, argument, or claim of error not presented at the trial court level. *Lindblad v. Boeing Co.*, 108 Wn. App. 198, 207, 31 P.3d 1 (2001). A party must inform the court of the rules of law it wishes the court to apply and afford the trial court an opportunity to correct any error. *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983). Failure to do so precludes raising the error on appeal. *Smith*, 100 Wn.2d at 37. If Ryan Ward opposed Judge Mitchell's signing of the findings of fact, he could and should have brought the matter to the attention of the court in order to correct the signature before appealing.

13

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with RCW 2.06.040, the rules governing unpublished opinions.

### *Unlawful Search and Seizure*

Ryan Ward contends his constitutional rights were violated twice during his interaction with Officer Ismael Cano. He first contends that Officer Cano lacked reasonable, articulable suspicion to stop his car and detain him. He also contends that Officer Cano lacked grounds to frisk his person. Ward contends evidence of the glass pipe and methamphetamine must be suppressed as the "fruit of [a] poisonous tree." RP at 48. We reject his contentions.

### *Stop of BMW*

We review a trial court's denial of a CrR 3.6 suppression motion to determine whether substantial evidence supports the trial court's challenged findings of fact and, if so, whether the findings support the trial court's conclusions of law. *State v. Cole*, 122 Wn. App. 319, 322-23, 93 P.3d 209 (2004). The constitutionality of a warrantless stop is a question of law we review de novo. *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).

As a general rule, warrantless searches and seizures are per se unreasonable, in violation of the Fourth Amendment and article I, section 7 of the Washington State Constitution. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). There are a few

jealously and carefully drawn exceptions to the warrant requirement, which include exigent circumstances, searches incident to a valid arrest, inventory searches, plain view searches, and *Terry* investigative stops. *Terry*, 392 U.S. at 21; *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). The State bears the burden of demonstrating that a warrantless seizure falls into a narrow exception to the rule. *State v. Doughty*, 170 Wn.2d 57, 61, 239 P.3d 573 (2010). A seizure is not justified by what a subsequent search discloses. *Lesnick*, 84 Wn.2d at 944.

To justify a *Terry* stop, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. *Terry*, 392 U.S. at 21; *State v. Armenta*, 134 Wn.2d 1, 10, 948 P.2d 1280 (1997). The officers' actions must be justified at their inception. *Gatewood*, 163 Wn.2d at 540. The level of articulable suspicion necessary to support an investigative detention is "a substantial possibility that criminal conduct has occurred or is about to occur." *State v. Kennedy*, 107 Wn.2d 1, 6, 726 P.2d 445 (1986).

In this case, dispatch informed Officer Cano that three to four men argued at Jack in the Box, that this argument escalated, and the men were driving away in a black BMW. Based on dispatch's reports, Cano reasonably believed that the men committed an assault or the crime of disorderly conduct and those men were leaving the scene. If Cano had observed the pushing himself, he would hold specific and articulable facts to support his investigative detention of Ward. But Cano relied on information from

15

unknown informants. Ryan Ward argues that this reliance on the uncorroborated

conclusions of unidentified informants renders his stop and seizure unconstitutional.

The informants were a bystander and employee of Jack in the Box. Generally,

citizen-informants are deemed presumptively reliable sources of information. *State v.*

*Wakeley*, 29 Wn. App. 238, 241, 628 P.2d 835 (1981). But still, an informant's tip

cannot constitutionally provide police with such a suspicion unless it possesses sufficient

"indicia of reliability." *State v. Sieler*, 95 Wn.2d 43, 47, 621 P.2d 1272 (1980); *Adams v.*

*Williams*, 407 U.S. 143, 147, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). As noted in *Sieler*:

"'It is difficult to conceive of a tip more 'completely lacking in indicia of reliability' than

one provided by a completely anonymous and unidentifiable informer, containing no

more than a conclusionary assertion that a certain individual is engaged in criminal

activity.'" 95 Wn.2d at 47 (quoting *Lesnick*, 84 Wn.2d at 944).

Ryan Ward analogizes to two cases, *Lesnick* and *Sieler*, to argue that Officer

Cano's reliance on unknown informants was unreasonable and that Cano could not

assume the informants were reliable. In *Lesnick*, Charles Lesnick challenged his

conviction for possession of gambling devices claiming law enforcement wrongfully

seized evidence. An anonymous informant called police to report a van pulling a trailer,

the driver of which was attempting to sell punchboards in the city. The caller also

supplied a license plate number. The caller remained completely anonymous, refusing to

identify himself and not providing any information as to the source of his knowledge.

16

Following the tip, police located the van and pulled it over. In plain view, officers saw the offending gambling devices. The *Lesnick* court held, "The fact that the anonymous tipster accurately described the defendant's vehicle is not such corroboration or indicia of reliability as to make reasonable the officers' action." *Lesnick*, 84 Wn.2d at 943.

In *Sieler*, James Tuntland, while waiting in the school parking lot for his son, observed what he believed to be a drug sale in another car in the parking lot. Tuntland informed the school secretary by telephone of his conclusion, described the car, reported its license number, apparently gave her his telephone number, and left. The secretary called police, who radioed two officers that a drug transaction had possibly occurred in the school parking lot in a black and gold Dodge with a certain license number. The officers knew nothing about the informant beyond his name, nor why he concluded a drug transaction had occurred. The State and this court distinguished *Sieler* from *Lesnick* on the ground that Tuntland provided his name. Unconvinced, our Supreme Court wrote:

> We are not persuaded by this attempted distinction. The reliability of an anonymous telephone informant is not significantly different from the reliability of a named but unknown telephone informant. Such an informant could easily fabricate an alias, and thereby remain, like an anonymous informant, unidentifiable.
> . . . .
> [T]he State generally should not be allowed to detain and question an individual based on a reliable informant's tip which is merely a bare conclusion unsupported by a sufficient factual basis which is disclosed to the police prior to the detention.

*Sieler*, 95 Wn.2d at 48. In a footnote, however, the *Sieler* court commented:

17

Of course such a conclusory allegation by a reliable informant is sufficient to justify an investigatory detention if, as *Lesnick*'s second and third criteria indicate, it is corroborated by adequate police observation.

*Sieler*, 95 Wn.2d at 49 n.1.

Echoing *Lesnick*, the *Sieler* court wrote:

While the police may have a duty to investigate tips which sound reasonable, [(1)] absent circumstances suggesting the informant's reliability, *or* some corroborative observation which suggests either [(2)] the presence of criminal activity *or* [(3)] that the informer's information was obtained in a reliable fashion, a forcible stop based solely upon such information is not permissible.

*Sieler*, 95 Wn.2d at 47 (quoting *Lesnick*, 84 Wn.2d at 944) (emphasis added). This is a disjunctive test.

Officer Ismael Cano depended on reliable information. Unlike *Lesnick* and *Sieler*, there were two informants, Eric Whitemarsh and a Jack in the Box employee. Each informant provided dispatch a phone number and neither refused to be identified. Two independent sources of information may provide support for the other's veracity. *Kennedy*, 107 Wn.2d at 8. At least one informant provided dispatch real-time updates, which dispatch relayed to Officer Cano. One informant reported a fighter was leaving the restaurant in a BMW. Officer Cano saw a black BMW leave Jack in the Box as dispatch reported the exit. Thus, Officer Cano directly observed action that corroborated the informant's story.

18

We conclude that the trial court did not err when it ruled that Officer Cano had reasonable, articulable suspicion to support his investigative stop of Ward.

### *Protective Frisk*

We also conclude the trial court did not err when it ruled that Officer Ismael Cano's frisk of Ryan Ward meets constitutional muster.

This court employs the same standard of review as for investigatory detentions. "We review a trial court's denial of a CrR 3.6 suppression motion to determine whether substantial evidence supports the trial court's challenged findings of fact and, if so, whether the findings support the trial court's conclusions of law." *Cole*, 122 Wn. App. at 322-23. This court reviews de novo whether a protective frisk was justified under the circumstances. *State v. Ibrahim*, 164 Wn. App. 503, 508, 269 P.3d 292 (2011).

During a *Terry* stop, the officer may briefly frisk the individual for weapons if he reasonably believes his safety or that of others is endangered. *Garvin*, 166 Wn.2d at 250. "For a permissible *Terry* stop the State must show that (1) the initial stop is legitimate; (2) a reasonable safety concern exists to justify the protective frisk for weapons; and (3) the scope of the frisk is limited to the protective purposes." *Duncan*, 146 Wn.2d at 172. "'[C]ourts are reluctant to substitute their judgment for that of police officers in the field. A founded suspicion is all that is necessary, some basis from which the court can determine that the [frisk] was not arbitrary or harassing.'" *State v. Collins*, 121 Wn.2d 168, 173, 847 P.2d 919 (1993) (alterations in original) (emphasis and internal quotation

19

marks omitted) (quoting *State v. Belieu*, 112 Wn.2d 587, 601-02, 773 P.2d 46 (1989)). An officer's "right to act was not invalidated when it turn[s] out, after the fact, that the pocket contained contraband instead of a weapon." *State v. Harper*, 33 Wn. App. 507, 511, 655 P.2d 1199 (1982).

Ryan Ward correctly notes that only objects that feel like weapons in a superficial pat down of the outer clothing may be removed and examined under *Terry*. *Terry*, 392 U.S. at 21; *State v. Horton*, 136 Wn. App. 29, 38, 146 P.3d 1227 (2006). On this basis, Ward asserts that a round glass pipe does not feel like a metal knife, even when wrapped in a paper towel. The State counters that this initial frisk was so limited in scope that Officer Cano did not notice the screwdriver in Ward's back pocket.

Here, Officer Ismael Cano responded to reports of an assault or disorderly conduct. Ryan Ward claimed that a knife and pepper spray were under the car's front seat. Ward reached under the seat. Against Officer Cano's request, Ward reached under the seat a second time. Under these circumstances, it was reasonable for Officer Cano to believe his safety was endangered. Officer Cano's frisk did not exceed the scope of this belief. Cano testified that he limited the frisk to the outside of Ward's clothing, only patting down for weapons. Cano felt a hard object wrapped in paper in Ward's front-left pocket, which he believed might be a knife. Because the object felt to Cano that it could be used as a weapon, and this court defers to his realistic impressions, it was reasonable for Cano to remove the object in order to ensure that it was not a weapon.

20

CONCLUSION

We affirm the conviction of Ryan Ward.

_____
Fearing, J.

WE CONCUR:

_____       _____
Korsmo, J.                             Lawrence-Berrey, J.