FILED
COURT OF APPEALS
DIVISION II

2014 JAN -7 AM 10: 22

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

STATE OF WASHINGTON,

                Respondent,

   v.

Z.U.E.,

                Appellant.

No. 43289-7-II

PUBLISHED OPINION

MAXA, J. – ZUE appeals his juvenile adjudication for possession of a controlled substance (marijuana). He asserts that the trial court erred by denying his motion to suppress the marijuana, which was obtained during a search after an investigative stop of ZUE and three other vehicle occupants. Specifically, he argues that officers lacked the well-founded suspicion that ZUE or the other occupants were connected to actual or potential criminal activity necessary to conduct a lawful investigative stop of his vehicle. Because the citizen informants' tips that led to the investigative stop did not have sufficient indicia of reliability and the police officers' observations were unable to corroborate the presence of criminal activity, we hold that under the totality of the circumstances the stop was an unlawful seizure. Therefore, we reverse the trial court's denial of ZUE's suppression motion, vacate his conviction, and dismiss the charge with prejudice.

FACTS

On the afternoon of October 2, 2011, Tacoma police received a 911 call reporting that an individual was running with a gun in the area of Oakland Park. The caller stated that (1) the man was a shirtless black male, 18 to 19 years old, 5 feet 10 inches tall, 145 pounds, and appeared almost bald with short dark hair; and (2) he was holding a gun down by his side, ducking in and out of houses and cars, and at one point he was seen holding the gun in a ready position. At least three officers responded to Oakland Park, which was a known gang hangout and the site of multiple gang-related incidents in the previous year.

As the officers were responding, dispatch advised that multiple callers had reported that more individuals were involved and that approximately eight of those individuals – including the shirtless man with a gun – were in a two-door white car. Dispatch subsequently advised that a caller had reported that the car was gray, not white, the shirtless man with a gun had gotten into the car, and the car was headed toward Union on Center Street. These callers were not identified.

Dispatch updated the officers again, stating that another caller had observed a black female handing a gun to the shirtless male. The caller described her as 17 years old, medium height, slim, and wearing a black jacket, blue jeans and black shoes with blue trim.

Tacoma police had limited information on the 911 callers. The record reflects that the first caller gave his name, telephone number, and address to dispatch. Another caller provided her first name, cell phone number, and location. One caller was uncooperative and merely reported a fight and a man with a gun. The officers knew the name of one of the callers, but did not know how many 911 callers there were or the callers' identities. The officers also did not

attempt to contact or obtain more information from any of the callers before conducting the investigative stop.

When the officers arrived in the area they did not see anyone in the park. As they checked the area they observed two females walking about one-half block away, and one of the females appeared to match the caller's description of the woman who handed off the gun. However, they continued to search for the man with the gun rather than make contact with the female subject.

The officers then contacted an unnamed woman at an apartment building overlooking the park. The woman stated that there had been a large brawl in the park, several of the participants had their shirts off, and the participants left in four separate vehicles. But she could not provide any information about the subjects or their vehicles. She did not say anything about a male or a female with a gun.

As they continued their area check the officers again saw the two females, who now were in a parking lot in front of a flower shop at the intersection of Center and Union. This location was near the area where dispatch had reported the gray car carrying the shirtless man with a gun was headed. The women approached a small gray car, and officers noticed that one of the women exactly matched the description of the woman who handed off the gun except she was not wearing a black jacket. One of the officers testified that the female's age, race, build, attire, as well as time and proximity led him to believe that she may have been involved in the park incident. The woman got into the back seat of the gray car, which appeared to have two men in the front seat. The two men were wearing shirts and both had hair, so they did not match the description of the bald, shirtless man.

No. 43289-7-II

Based on the available information, the officers believed they were investigating a minor in possession of a firearm and a gang-related assault with a deadly weapon. The officers approached the vehicle on foot with their firearms drawn, using a " 'felony stop' " technique. Clerk's Papers (CP) at 92. The officers instructed the occupants of the vehicle to put their hands up, which they did. The officers waited a few minutes for other officers to arrive and then directed the vehicle occupants to exit the vehicle one at a time. The driver and two female passengers exited the vehicle and were detained in handcuffs without incident.

ZUE, another passenger, was the last person to exit the vehicle. One of the officers believed ZUE was not responding to instructions and became concerned that he was reaching for a concealed weapon. As a result, the officer "touch[ed]" his electronic control tool to ZUE, handcuffed ZUE, and arrested him for obstruction. Report of Proceedings at 55. Officers searched ZUE incident to arrest and found marijuana on his person. Officers did not locate any guns.

The State charged ZUE with unlawful possession of a controlled substance (marijuana) and obstructing a law enforcement officer. ZUE moved to suppress any evidence obtained during the stop as the fruit of an unlawful seizure. The trial court conducted a combination CrR 3.6 hearing and bench trial. The trial court denied ZUE's suppression motion, ruling that the stop was supported by reasonable suspicion of criminal activity and that the scope of the stop was reasonable. The trial court entered detailed findings of fact and conclusions of law. The trial court then adjudicated ZUE not guilty of obstructing a law enforcement officer and guilty of unlawful possession of a controlled substance (marijuana). ZUE appeals.

4

No. 43289-7-II

ANALYSIS

A. STANDARD OF REVIEW

When reviewing the trial court's denial of a CrR 3.6 suppression motion, we determine whether substantial evidence supports the challenged findings of fact and whether the findings of fact support the conclusions of law. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'" *Garvin*, 166 Wn.2d at 249 (quoting *State v. Reid*, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999)). Unchallenged findings of fact are considered verities on appeal. *State v. Lohr*, 164 Wn. App. 414, 418, 263 P.3d 1287 (2011). We review de novo the trial court's conclusions of law pertaining to the suppression of evidence. *Garvin*, 166 Wn.2d at 249.

B. JUSTIFICATION FOR INVESTIGATIVE STOP

ZUE challenges the trial court's denial of his motion to suppress evidence discovered in the course of the investigative stop.[1] Following the suppression hearing, the trial court entered a finding that (1) the officers "reasonably believed" that one or more of the suspect car's occupants were related to a possible assault with a deadly weapon and/or unlawful possession of a firearm and were armed or dangerous and (2) a reasonably prudent person with the information available to the officers at the time of the contact would believe that one or more of the occupants were

---

[1] ZUE also challenges two specific findings of fact with regard to the suppression hearing. We need not address these findings because they have no bearing on our analysis of the court's legal conclusion that the investigatory stop was lawful. In addition, ZUE challenges two findings of fact entered after the bench trial. Because we reverse we need not address these findings.

5

related to the 911 reports and were armed and dangerous.[2] CP at 101. On this basis the trial court concluded that the officers' detention of the car was lawful. We disagree.

1. Standards for Warrantless Stop

Under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution, a police officer generally cannot seize a person without a warrant supported by probable cause. *Garvin*, 166 Wn.2d at 249; *State v. Acrey*, 148 Wn.2d 738, 745-46, 64 P.3d 594 (2003) (addressing only Fourth Amendment). A warrantless seizure is considered per se unconstitutional unless it falls within an exception to the warrant requirement. *State v. Rankin*, 151 Wn.2d 689, 695, 92 P.3d 202 (2004); *Acrey*, 148 Wn.2d at 746. One established exception is a brief investigatory detention of a person, commonly called a *Terry*[3] stop. *Acrey*, 148 Wn.2d at 746. A police officer may conduct a warrantless investigative stop based upon less evidence than is needed to establish probable cause to make an arrest. *Acrey*, 148 Wn.2d at 746-47. But the officer must have "a reasonable suspicion, grounded in specific and articulable facts, that the person stopped has been or is about to be involved in a crime." *Acrey*, 148 Wn.2d at 747. "A reasonable, articulable suspicion means that there 'is a substantial possibility that criminal conduct has occurred or is about to occur.'" *State v. Snapp*, 174 Wn.2d 177, 197-98, 275 P.3d 289 (2012) (quoting *State v. Kennedy,* 107 Wn.2d 1, 6, 726 P.2d 445 (1986)). The officer's suspicion must relate to a particular crime rather than a generalized

---

[2] This finding was in a section entitled "Findings as to Disputed Facts," but the ultimate issue of whether a stop was justified is a conclusion of law. CP at 101 (capitalization omitted); *State v. Bailey*, 154 Wn. App. 295, 299, 224 P.3d 852 (2010). Where a conclusion of law is erroneously labeled as a finding of fact, we review it de novo as a conclusion of law. *Casterline v. Roberts*, 168 Wn. App. 376, 383, 284 P.3d 743 (2012).

[3] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

suspicion that the person detained is "up to no good." *State v. Bliss*, 153 Wn. App. 197, 204, 222 P.3d 107 (2009).

We determine the propriety of an investigative stop – the reasonableness of the officer's suspicion – based on the "totality of the circumstances." *Snapp*, 174 Wn.2d at 198. The focus is on what the officer knew at the time of the stop. *State v. Lee*, 147 Wn. App. 912, 917, 199 P.3d 445 (2008). No subsequent events or circumstances can retroactively justify a stop. *State v. Mendez*, 137 Wn.2d 208, 224, 970 P.2d 722 (1999), *abrogated on other grounds by Brendlin v. California,* 551 U.S. 249, 255, 259 n.5, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007). A court must base its evaluation of reasonable suspicion on " 'commonsense judgments and inferences about human behavior.' " *Lee*, 147 Wn. App. at 917 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)).

Whether a warrantless investigative stop was justified or represents a constitutional violation is a question of law that we review de novo. *State v. Bailey*, 154 Wn. App. 295, 299, 224 P.3d 852 (2010). The State bears the burden of showing the propriety of an investigative stop. *Acrey*, 148 Wn.2d at 746. If the initial stop was unlawful, the evidence discovered during that stop are not admissible because they are fruits of the poisonous tree. *Kennedy,* 107 Wn.2d at 4.

2. Suspicion Based on Citizen Informant

Here, reports from citizen informants provided the sole basis for the police officers' suspicions that the young woman entering the gray car had committed the crime of a minor in possession of a firearm and that one of the men in the car had been running with a gun. ZUE argues that such informant information cannot support an investigative stop under the circumstances of this case.

Our Supreme Court first addressed this issue in *State v. Lesnick*, 84 Wn.2d 940, 943, 530 P.2d 243 (1975) and confirmed that information supplied by another person may authorize an investigative stop. However, the court emphasized that the informer's tip must demonstrate some " 'indicia of reliability.' " *Lesnick*, 84 Wn.2d at 943 (quoting *Adams v. Williams*, 407 U.S. 143, 147, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972)). The court held that this reliability can be established if (1) the informant was reliable or (2) the officer's corroborative observation suggests either the presence of criminal activity or that the information was obtained in a reliable fashion. *Lesnick*, 84 Wn.2d at 944.

The Supreme Court in *State v. Sieler*, 95 Wn.2d 43, 48, 621 P.2d 1272 (1980), subsequently clarified that "reliability by itself generally does not justify an investigatory detention." Instead, a reliable informant's tip also must be supported by a "sufficient factual basis" or "underlying factual justification" so officers can assess the probable accuracy of the informant's conclusion. *Sieler*, 95 Wn.2d at 48. The court emphasized that it made no sense to require evidence of the informant's reliability but nothing concerning the source of the information. *Sieler*, 95 Wn.2d at 48. This additional requirement of a sufficient factual basis for the informant's report allows officers to evaluate whether a reliable informant has "misconstrued innocent conduct." *Sieler*, 95 Wn.2d at 48. Including this requirement creates an analysis similar to the *Aguilar–Spinelli* test for issuance of a warrant based on an informant's tip.[4]

---

[4] Washington courts follow the *Aguilar–Spinelli* test under article I, section 7 of the state constitution to determine whether issuance of a warrant was supported by probable cause. *State v. Ollivier*, ___ Wn.2d ___, 312 P.3d 1, 22 (2013). *Aquilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1983) were overruled by *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 527 (1983), in which a totality of the circumstances analysis was adopted for purposes of the Fourth Amendment.

Subsequently, our Supreme Court in *Kennedy*, stated the indicia of reliability test without including the additional basis of knowledge requirement stated in *Sieler*. 107 Wn.2d at 7. Division One of this court noted that *Kennedy* and the totality of the circumstances standard compels the conclusion that the " 'basis of knowledge' " concept grounded in the *Aguilar–Spinelli* test (used to evaluate whether a warrant is supported by probable cause) does not extend to the indicia of reliability of informant tips for investigatory stops. *State v. Marcum*, 149 Wn. App. 894, 904-05, 205 P.3d 969 (2009) (quoting *State v. Jackson*, 102 Wn.2d 432, 436, 688 P.2d 136 (1984)). In *Marcum*, the court indicated that the informant's basis of knowledge was relevant but not essential to the analysis of an investigatory stop. 149 Wn. App. at 904.

Under *Sieler* and *Lesnick*, we hold that an informant's report can provide reasonable justification for an officer's investigative stop in two situations: (1) when the information available to the officer showed that the informant was reliable or (2) when the officer's observations corroborate either the presence of criminal activity or that the informant's report was obtained in a reliable fashion. 95 Wn.2d at 47-48; 84 Wn.2d at 944. We need not decide whether the informant's basis of knowledge is a requirement or merely a factor to be considered in the totality of the circumstances analysis because, under either approach, the circumstances here did not warrant an investigatory stop.

3. Reliable Informant/Factual Basis

a. "Unknown" Informant

Known citizen informants (as distinguished from anonymous or "professional" informants) generally are presumed to be reliable. *State v. Gaddy*, 152 Wn.2d 64, 72-73, 93 P.3d 872 (2004); *State v. Wakeley*, 29 Wn. App. 238, 241, 628 P.2d 835 (1981). For investigative stops, the same degree of reliability need not be shown for a "citizen" as opposed to a

9

"professional" informant. *Kennedy*, 107 Wn.2d at 8. However, our Supreme Court has not adopted a presumption of reliability for anonymous citizen informants in evaluating investigative stops. In *Lesnick*, the court held that an anonymous caller reporting that the driver of a van with a certain license plate number was attempting to sell gambling devices was insufficient to establish the well-founded suspicion needed to support an investigative stop of the van. 84 Wn.2d at 941, 944. The court stated, " 'It is difficult to conceive of a tip more completely lacking in indicia of reliability than one provided by a completely anonymous and unidentifiable informer, containing no more than a conclusionary assertion that a certain individual is engaged in criminal activity.' " *Lesnick*, 84 Wn.2d at 944 (internal quotation marks omitted) (quoting *State v. Lesnick*, 10 Wn. App. 281, 285, 518 P.2d 199 (1973), *aff'd*, 84 Wn.2d 940).

Even a named, but otherwise unknown, citizen informant is not presumed to be reliable and a report from such an informant may not justify an investigative stop. In *Sieler*, a father waiting to pick up his son at high school telephoned the school secretary to report that he witnessed a drug sale in another car in the parking lot. *Sieler*, 95 Wn.2d at 44-45. He provided his name and telephone number. *Sieler*, 95 Wn.2d at 45. The secretary relayed this information to the police. *Sieler*, 95 Wn.2d at 45. The court held that the informant's name and telephone number were not enough to establish his reliability, stating, "The reliability of an anonymous telephone informant is not significantly different from the reliability of a named but unknown telephone informant. Such an informant could easily fabricate an alias, and thereby remain, like an anonymous informant, unidentifiable." *Sieler*, 95 Wn.2d at 48.

We relied on *Sieler* in *State v. Hopkins*, 128 Wn. App. 855, 858-59, 117 P.3d 377 (2005), where an unknown 911 caller reported that a minor might be carrying a gun and accurately described the minor's location and provided a partially accurate description. The informant gave

10

his name and cell phone number and a second call provided police with another phone number. *Hopkins*, 128 Wn. App. at 858. We held that despite the general presumption that a citizen informant is reliable, providing the name and cell phone number of an informant unknown to officers is insufficient to establish reliability and cannot by itself justify an investigative stop. *Hopkins*, 128 Wn. App. at 863-64.

Here, two 911 callers provided basic information: one provided his name, telephone number, and address and another provided her first name, cell phone number and location. However, the officers did not know the callers and knew nothing else about them. And the officers did not contact the callers to obtain more information about their reliability. The absence of any information regarding the informants beyond basic identification precludes a finding of reliability.

The State argues that the fact that multiple callers provided similar information shows reliability here. *See generally Kennedy*, 107 Wn.2d at 8 ("The two independent sources of information each provide support for the other's veracity."). The number of callers may be a factor to be considered in the broader totality of the circumstances analysis, but the State cites no authority addressing the potential cross corroboration of multiple 911 calls. On the existing briefing and under the facts here, there is no showing that one unknown caller bolstered the credibility of another unknown caller. The State also argues that informants are more reliable when they call 911 as opposed to a nonemergency number. Although the dissent in *Hopkins* made the same argument, the majority did not adopt it. 128 Wn. App. at 869-70 (Quinn-Brintnall, C.J. dissenting). We disagree that calling 911, without more, can establish an unknown informant's reliability to purposes of justifying an investigative stop.

11

We hold under *Sieler* and *Hopkins* that obtaining the unknown informants' names and contact information is not enough to establish their reliability. We also hold under *Lesnick* that here the State has not sustained its burden of proving that the officers had enough information to establish that the anonymous callers and the unnamed woman the officers personally contacted were reliable.

> b.  Factual Basis

Even if an informant is reliable, the court in *Sieler* held that an informant's "bare conclusion" that criminal conduct had occurred "unsupported by any factual foundation" was insufficient to justify an investigative stop. 95 Wn.2d at 49. Whether the informant's factual basis is a strict requirement or only one factor, an officer's information regarding the factual basis for the informant's conclusion that criminal activity has occurred is relevant to the totality of the circumstances analysis. *Sieler*, 95 Wn.2d at 48-49.

In *Hopkins* we generally stated this requirement as whether the informant's tip "contains enough objective facts" to justify the detention. 128 Wn. App. at 862-63. However, we also made it clear that these "objective facts" must involve *criminal* activity, not merely innocuous information such as an accurate description of the subject or his or her location. *Hopkins*, 128 Wn. App. at 862-64. " 'The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.' " *Hopkins*, 128 Wn. App. at 864 (quoting *Florida v. J.L.*, 529 U.S. 266, 272, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000)).

Here, the record does not reflect that the first caller expressly stated the basis for his knowledge that a man was running with a gun. The detailed information provided suggests that he was an eyewitness, and an informant's credibility is enhanced when he or she is an

12

eyewitness. *Lee*, 147 Wn. App. at 918. But we have suggested that officers may not presume that informants' tips are eyewitness accounts. *State v. Vandover*, 63 Wn. App. 754, 755-56, 759-60, 822 P.2d 784 (1992) (tip that a man in a gold colored Maverick was brandishing a sawed-off shotgun in front of a downtown restaurant did not justify investigative stop of man leaving that location in a green Maverick). As a result, the factual basis of the first caller's tip was unclear. On the other hand, the record does establish that a caller "observed" the young woman hand a gun to a man. CP at 90. An eyewitness's observation of events may provide a sufficient factual basis for a tip. *See Lee*, 147 Wn. App. at 918-19.

However, a key portion of the informant's report concerning the young woman was that she was approximately 17 years old. Her age was significant because the officers stated that they suspected her of committing the crime of being a *minor* in possession of a firearm. If the woman was not a minor, there was no basis for suspecting that her possession of a firearm was unlawful because carrying a gun is not automatically a crime. But the caller did not explain the factual basis for the estimate of the young woman's age. The estimate was a "bare conclusion unsupported by any factual foundation." *Sieler*, 95 Wn.2d at 49. As a result, we hold that the factual basis requirement was not satisfied for the officers' suspicion that the woman was involved in *criminal* activity.

4.   Police Corroboration

   a.   Corroboration of Criminal Activity

Even if an informant is unreliable and/or the tip lacks sufficient factual basis, an officer's corroboration can justify an investigative stop. The informant's tip may support an investigative stop if an officer observes some illegal, dangerous, or suspicious activity. *Lesnick*, 84 Wn.2d at 944. The activity need not be particularly blatant. *See Wakeley*, 29 Wn. App. at 239, 241-43

13

(stop justified when an informant identified the subject as leaving in an orange colored Pinto after gunshots were heard and the officer passing an orange Pinto observed the driver attempting to hide something in his jacket). And a police officer may rely on his or her experience to identify seemingly innocuous facts as suspicious. *State v. Moreno*, 173 Wn. App. 479, 492-93, 294 P.3d 812, *review denied*, 177 Wn.2d 1021 (2013). Facts that appear innocuous to an average person may appear suspicious to a police officer in light of past experience. *Moreno*, 173 Wn. App. at 493 (an officer with considerable experience with local gangs responding to multiple reports of gunfire in a gang neighborhood, who saw a car hurriedly leaving an alley driven by a man wearing a shirt of a color associated with a rival gang had a reasonable suspicion that the driver was involved in the shooting).

On the other hand, as with the factual basis requirement, confirming a subject's description or location or other innocuous facts does not satisfy the corroboration requirement. *See Lesnick*, 84 Wn.2d at 943 (the fact that informant accurately described the defendant's vehicle is not sufficient corroboration for a stop). In *Hopkins*, an informant reported that a young man had a gun, described the man, and provided his location. 128 Wn. App. at 858. Officers observed a man who resembled the informant's description at the described location, but did not observe a gun or any illegal, dangerous, or suspicious activity. *Hopkins*, 128 Wn. App. at 859. Based on these facts, we held that an investigatory stop was not justified. *Hopkins*, 128 Wn. App. at 865-66; *see also State v. Hart*, 66 Wn. App. 1, 9, 830 P.2d 696 (1992) (officer's observation of defendant confirming informant's description and defendant's location did not satisfy the corroboration requirement); *Campbell v. Dep't of Licensing*, 31 Wn. App. 833, 834-35, 644 P.2d 1219 (1982) (anonymous motorist's tip that a drunk driver was travelling in the

opposite direction and description of the car did not justify investigative stop of car matching the motorist's description).

Here, the informant stated that a young woman had handed a gun to a male subject in Oakland Park. The officers located a woman matching the description walking with another woman near the park, but they did not see anyone else in the park or nearby. The officers observed no illegal or suspicious behavior from the woman or her companion at that time. Officers observed the woman again in a flower shop parking lot getting into a car, but again she was engaged in no suspicious behavior. And nothing about the woman's innocuous behavior would signal a suspicion in an experienced officer. In other words, the officers did not make any corroborative observations suggesting that the young woman had engaged in actual or potential criminal activity.

With regard to the young man running with the gun, the officers never located anyone matching the informants' description of a shirtless, almost bald man. The State argues that the officers had reasonable suspicion that one of the men in the front seat of the gray car was that man because a caller reported that he was in a gray vehicle. However the record does not support this argument. A gray car hardly is unique, and merely confirming a vehicle description does not satisfy the corroboration requirement. *Lesnick*, 84 Wn.2d at 943. And there was no testimony that ZUE or the other male occupant even slightly resembled the description of the shirtless bald man from the park. Conversely, the record reflects that the males in the front seat were wearing shirts and had hair.

The State also argues that the officers corroborated the details of the 911 calls by contacting a witness who confirmed that a large brawl had occurred and that the subjects left in four different vehicles. However, this witness said nothing about a young woman or a man with

a gun, or about their possible connection to the brawl. And the officers saw no indication that any brawl had in fact occurred. Further, the witness did not give her name and the record does not show that the officers knew her. We hold that information obtained from an anonymous, unknown informant that the officers themselves could not confirm is not sufficient to corroborate the report of another unknown informant.

Finally, the State emphasizes that the reported activities took place in a high crime area. However, the presence of the subjects in such an area cannot by itself give rise to a reasonable suspicion that they were engaged in criminal activity. *Sieler*, 95 Wn.2d at 49.

We hold that the officers did not corroborate the presence of actual or potential criminal activity. All they corroborated was the young woman's description and what she was wearing, and the presence of a gray car. These observations of innocuous facts were insufficient to support an investigatory stop.

b.    Corroboration that Information Obtained in a Reliable Fashion

The court in *Lesnick* stated that an investigative stop could be justified if an officer's corroborative observations indicate that the informant's information was obtained in a reliable fashion. 84 Wn.2d at 944. For instance, in *Lee* the officer actually observed the informant interacting with the subject of the search and was able to corroborate how the informant obtained her information. 147 Wn. App. at 914-15, 922. A patrol officer witnessed a car pull up to a female pedestrian in a high-crime area and the occupants briefly speaking with her. *Lee*, 147 Wn. App. at 914-15. Then she walked quickly away, appearing frightened. *Lee*, 147 Wn. App. at 915. The officer contacted the pedestrian and asked if she was all right. *Lee*, 147 Wn. App. at 915. The pedestrian reported that two individuals in a specific car pulled over and told her to get in the vehicle to smoke crack cocaine while showing her that they possessed both crack and a

16

crack pipe. *Lee*, 147 Wn. App. at 915. The officer followed the vehicle and conducted an investigatory stop. *Lee*, 147 Wn. App. at 915. Division One of this court held that the anonymous informant's statements justified the stop because the circumstances were corroborated by the officer's own observations. *Lee*, 147 Wn. App. at 922.

Here, the officers had no personal knowledge regarding how the informants gathered their information. The information simply was relayed to them by the dispatcher. We hold that the officers had no corroborative observations that the callers obtained their information in a reliable fashion.

### 5. Seriousness of Criminal Activity

Although our Supreme Court has adopted specific rules for anonymous and unknown informants, those rules must be applied in the context of the totality of circumstances approach. *See Snapp*, 174 Wn.2d at 198. The court stated in *Lesnick*, "[N]o single rule can be fashioned to meet every conceivable confrontation between the police and citizen[s]. Evaluating the reasonableness of the police action and the extent of the intrusion, each case must be considered in light of the particular circumstances facing the law enforcement officer." 84 Wn.2d at 944. The court emphasized that a significant fact in that case – in which the stop was found unjustified – was that the suspected crime "posed no threat of physical violence or harm to society or the officers." *Lesnick*, 84 Wn.2d at 944. Conversely, the court indicated that tips involving "murder or threatened school bombings" would be judged in light of their particular facts. *Lesnick*, 84 Wn.2d at 945.

The Supreme Court repeated this theme in *Sieler*, stating that the criteria for evaluating information obtained by informants could not be analyzed in isolation. 95 Wn.2d at 50. "[T]he seriousness of the criminal activity reported by an informant can affect the reasonableness

17

calculus which determines whether an investigatory detention is permissible." *Sieler*, 95 Wn.2d at 50; *cf. State v. Franklin*, 41 Wn. App. 409, 412, 704 P.2d 666 (1985) ("The anonymity of an informant does not necessarily make an investigatory stop improper, especially when the informant's information indicates that a violent crime may occur.").[5]

*Sieler* and *Lesnick* recognize that we may apply a less stringent standard to assess the reasonableness of an investigative stop when police officers are called upon to swiftly respond to a significant threat to public safety. 95 Wn.2d at 50; 84 Wn.2d at 944-45; *see also State v. Randall*, 73 Wn. App. 225, 230, 868 P.2d 207 (1994) ("An officer acting on a tip involving the threat of violence and rapidly developing events does not have the opportunity to undertake a methodical, measured inquiry into whether the tip is reliable."). *But see Vandover*, 63 Wn. App. at 760 (danger to the public is a "factor which may make an investigatory stop reasonable under the circumstances where there are already indications that the informant's tip was reliable").

The parties have not briefed the standards for investigatory stops in emergent situations presenting a serious risk to public safety or analyzed the application of these facts to such standards. In addition, it is clear that more than mere possession of a firearm is necessary to support an investigatory stop. *J.L.*, 529 U.S. at 272-74; *see also Vandover*, 63 Wn. App. at 755, 760 (finding a traffic stop unreasonable when based on an anonymous call that the subject had brandished a sawed-off shotgun). Here, there does not appear to be any basis to believe that the young woman had possession of the gun at the time of the stop. And any brawl that had occurred at the park was over by the time the officers arrived. On the existing briefing and argument, it does not appear that a risk to public safety warranted the investigatory stop.

---

[5] The United States Supreme Court, while refusing to speculate, has suggested the possibility that "the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability." *J.L.*, 529 U.S. at 273-74.

18

6. Summary

Police officers conducted an investigative stop of ZUE based solely on information provided by 911 callers even though police officers did not know the reliability of the callers, did not know the factual basis of the caller's assertion of criminal activity, did not observe circumstances corroborating the reports of criminal activity, and could not corroborate that the information was obtained in a reliable fashion. Further, although a report of a possession of a gun in public can raise public safety concerns that could allow for a less stringent reliability analysis, here there was no indication of an immediate threat to public safety at the time of the stop.

Under the totality of these circumstances, we hold that the trial court erred in concluding that the circumstances supported an investigative stop of ZUE's vehicle.[6] Accordingly, we reverse the trial court's denial of ZUE's motion to suppress evidence obtained in an unlawful investigative stop. Because that evidence was the only basis for ZUE's conviction for possession

---

[6] ZUE also challenges the trial court's legal conclusion that the scope of the investigative stop was permissible. He argues that the officers' use of firearms and handcuffs was not reasonable under the circumstances and converted the stop into an arrest, which would require the officers to have probable cause. Because we hold that the stop was unlawful from its outset, we do not reach this issue.

19

No. 43289-7-II

of a controlled substance, we further vacate ZUE's conviction and dismiss the charge with

prejudice.

_____
MAXA, J.

We concur:

_____
PENOYAR, P.J.

_____
VERELLEN, J.

20