FILED
COURT OF APPEALS
DIVISION II

2014 SEP -3 AM 3: 22

STATE OF WASHINGTON

BY No. 44232-9-II
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

STATE OF WASHINGTON,

Respondent,

v.

NICHOLAS KEITH MAYER,

Appellant.

UNPUBLISHED OPINION

Melnick, J. — Nicholas Mayer appeals his convictions for first degree robbery with two firearm enhancements, first degree burglary with two firearm enhancements, residential burglary, three counts of theft of a firearm, three counts of second degree unlawful possession of a firearm, and third degree theft. Nicholas[1] argues (1) insufficient evidence supported his first degree burglary conviction, (2) the jury instructions for first degree burglary violated his right to a unanimous jury verdict, (3) the trial court erred by denying his motions to suppress statements he made to the officers, (4) the State improperly vouched for one of its key witnesses' credibility, and (5) the trial court's denial of his motion to continue the trial denied him effective assistance of counsel. We affirm Nicholas's convictions.

## FACTS

### I.  BACKGROUND

On February 9, 2012, just after 9:00 P.M., officers responded to a 911 call regarding a robbery at the KC Teriyaki restaurant in Salmon Creek, Washington. When the officers arrived, they interviewed the restaurant's owner, Hui Choe, a restaurant employee, Aljuarsmi Ortiz, and

---

[1] We refer to Nicholas Mayer and Emily Mayer by their first names to avoid confusion.

two other witnesses. The officers believed that it was likely an "inside job," because the suspects obviously knew about the side entrance and the restaurant's closing procedures. 1 Report of Proceedings (RP) at 21.

Choe told the officers about his former employee, Emily Mayer, whom he had fired a few months prior because he suspected her of stealing money. Choe also told the officers that Emily had told him she had an older brother who did drugs. After reviewing their databases, the officers determined that Nicholas was Emily's older brother. At that point, the officers listed Nicholas and Emily as potential suspects.

KC Teriyaki's closes at 9:00 P.M. Choe's usual closing procedure is to turn off the open sign and put the money from the day's sales into a bank bag. At closing on February 9, Choe removed the money from the register, approximately $800, and put it in a bank bag with his wallet. He set the bag on a stool behind the counter. Choe then went into the kitchen to prepare an order for a customer who had come in late; Choe told Ortiz he could leave for the night. Ortiz stated that when Ortiz opened the side door to leave, two young men, approximately six feet tall, wearing hoodies and bandanas over their faces and holding guns, pushed open the door, entered the restaurant, and demanded money. The two men noticed the bank bag on the chair, grabbed it, left through the side door, and ran across the street. Ortiz stated that it seemed as though the two men were waiting for someone to open the side door so they could get into the restaurant.

A customer in the restaurant witnessed two men and Ortiz scuffle. She stated that one of the two men had a handgun pointed at Ortiz, while the other grabbed something from under the counter. The customer's husband, who was waiting in his car outside the restaurant, saw two men with covered faces running from the side of the restaurant. He stated that one of them carried a gun. According to Choe, the restaurant's side door is an iron door that is kept closed

2

during business hours and, except in cases of emergencies, is used only by employees. The side door is hidden by bushes and cannot be seen from the road. Ortiz further explained that customers use the main, front entrance to enter the restaurant, and that the side door is used only by employees, usually to take out the trash and exit at the end of a shift.

The following night the officers received a call from a person who identified himself as "Matt." Clerk's Papers (CP) at 484. He provided the police his phone number. Matt stated (1) that a person named Nicholas Mayer was bragging about having recently robbed a Vancouver restaurant; (2) that Nicholas had a revolver that he recently gave away to someone; and (3) that Nicholas had a lot of cash, which was unusual for him. Matt also gave specific information that Nicholas was with his girlfriend Sarah Baker, riding in a grey pickup. Based on Matt's information and their investigation, the officers went to the particular location Matt provided and stopped a grey pickup. Inside the pickup were Nicholas, Baker, and another passenger, all of whom went to the police precinct for interviews.

Subsequently, Deputy Tom Dennison called Matt, who agreed to and did provide a statement. Dennison then interviewed Baker, who stated that Nicholas admitted to her that he had robbed a teriyaki restaurant.

Dennison later interviewed Nicholas. Before talking to him, Dennison read Nicholas his *Miranda*[2] rights from a card that he carried with him. Nicholas understood his rights, waived them, and agreed to have his interview recorded. After starting the recording, Dennison re-read Nicholas his *Miranda* rights. When asked if he understood his rights, Nicholas asked what he would do if he wanted an attorney and could not afford one. Dennison responded that if Nicholas was arrested and charged with a crime, when he went before a judge he would be

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

appointed an attorney if he could not afford one. Nicholas stated that he understood his rights and would talk to Dennison. Nicholas admitted his involvement in the KC Teriyaki restaurant robbery.

II. PROCEDURAL HISTORY

On February 24, 2012, the State charged Nicholas by amended information with first degree robbery with two firearm enhancements, first degree burglary with two firearm enhancements, residential burglary, three counts of theft of a firearm, three counts of second degree unlawful possession of a firearm, third degree theft, and first degree attempted trafficking in stolen property. Nicholas moved, under CrR 3.6, to suppress his statements, arguing that the officers unlawfully stopped and detained him. Nicholas also moved, under CrR 3.5, to suppress his alleged confession to the crimes, arguing that the officers gave him improper *Miranda* warnings. The trial court denied both motions and entered findings of fact and conclusions of law.

At the close of the State's case, the trial court dismissed the trafficking charge. The jury found Nicholas guilty on all other counts and the four firearm enhancements. Nicholas received a 306-month sentence, which included 240 months for the firearm enhancements. Nicholas appeals.

ANALYSIS

I. SUFFICIENT EVIDENCE SUPPORTS NICHOLAS'S FIRST DEGREE BURGLARY CONVICTION

Nicholas argues there is insufficient evidence to support his burglary conviction because he remained only in places open to the public in the KC Teriyaki restaurant. We disagree and hold that there is sufficient evidence beyond a reasonable doubt that Nicholas unlawfully entered and unlawfully remained in the restaurant.

Evidence is sufficient if, when viewed in a light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom," which should be interpreted most strongly against the defendant. *Salinas*, 119 Wn.2d at 201. Circumstantial evidence and direct evidence are deemed equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). "Credibility determinations are for the trier of fact and cannot be reviewed on appeal." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

> A person is guilty of first degree burglary
>
> if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

RCW 9A.52.020(1). "A person 'enters or remains unlawfully' in or upon premises when he or she is not then licensed, invited, or otherwise privileged to so enter or remain." RCW 9A.52.010(5). A license or privilege to enter or remain in a building that is only partly open to the public is not a license or privilege to enter or remain in that part of the building which is not open to the public. RCW 9A.52.010(5).

Whether a defendant enters or remains unlawfully in a building is decided on a case by case basis. *State v. Collins*, 110 Wn.2d 253, 258, 751 P.2d 837 (1988). An individual's presence "may be unlawful because of an implied limitation on, or revocation of, his privilege to be on the premises." *Collins*, 110 Wn.2d at 258. If an individual exceeds the scope of his invitation into a building, he has remained unlawfully therein. *Collins*, 110 Wn.2d at 255. Where a defendant's initial entry was clearly unlawful, the sufficiency of evidence that he or she remained unlawfully follows automatically. *State v. Cordero*, 170 Wn. App. 351, 366, 284 P.3d 773 (2012).

Here, Nicholas hid outside a side door to the KC Teriyaki restaurant. This iron door, not usually used by customers except in emergencies, is kept closed during business hours. It is used by employees to take the trash out and exit the restaurant at the end of a work shift. When Ortiz exited the side door after the restaurant's business hours, Nicholas pushed him back into the restaurant, entered the door with a gun drawn, and demanded money.

When drawing all reasonable inferences in the State's favor, we hold there is sufficient evidence that Nicholas entered and remained unlawfully in the KC Teriyaki restaurant. He exceeded the scope of his invitation. The time of Nicholas's entry occurred after the restaurant's normal business hours. Nicholas did not enter the restaurant through the front entrance or for the purpose of ordering or eating food; he forcefully entered through a hidden side entrance with the intent to steal money. Accordingly, we hold there is sufficient evidence that Nicholas unlawfully entered the restaurant. Thus, there is also sufficient evidence that he unlawfully remained in the closed restaurant while he completed the robbery.

II. THE TO CONVICT INSTRUCTION FOR FIRST DEGREE BURGLARY DID NOT VIOLATE NICHOLAS'S RIGHT TO A UNANIMOUS JURY VERDICT.

Nicholas argues there is insufficient evidence that he unlawfully remained in the restaurant and because the jury instructions stated the jury could find him guilty for either unlawful entering or unlawful remaining without requiring jury unanimity on either alternative, he was deprived of his constitutional right to a unanimous jury verdict. Because sufficient evidence supports that Nicholas *both* unlawfully entered and unlawfully remained in the restaurant, Nicholas received his constitutional right to a unanimous jury verdict.

We review alleged errors of law in jury instructions de novo. *State v. Barnes*, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005). We also review constitutional challenges de novo. *State v. Cubias*, 155 Wn.2d 549, 552, 120 P.3d 929 (2005).

6

Nicholas contends *State v. Klimes*, 117 Wn. App. 758, 73 P.3d 416 (2003), *overruled in part by State v. Allen*, 127 Wn. App. 125, 110 P.3d 849 (2005), supports this argument. But *Klimes* is no longer good law. In *Allen*, Division One of this court retreated from its overstatement in *Klimes* that the unlawful entering and unlawful remaining ways of committing burglary are repugnant to one another. 127 Wn. App. at 132. "Regardless of whether the defendant possessed an intent to commit a crime at the time of the unlawful entry, if the defendant unlawfully remains with the intent to commit a crime, we see no reason such conduct does not satisfy the requirements for burglary." *Allen*, 127 Wn. App. at 133. Thus, in most burglary cases, juries can be instructed as to both means and no special jury instruction or prosecutorial election of means is required. *State v. Johnson*, 132 Wn. App. 400, 409-10, 132 P.3d 737 (2006).

> So long as there is sufficient evidence as to each means or so long as a reviewing court can tell that the verdict was based on only one means which was supported by substantial evidence, a general verdict finding the defendant guilty of burglary will stand.

*Johnson*, 132 Wn. App. at 410.

Here, we already have found that there is sufficient evidence that Nicholas both unlawfully entered and unlawfully remained in the restaurant. Thus, this argument fails.

III. THE OFFICERS PROPERLY STOPPED AND DETAINED NICHOLAS

Nicholas argues the trial court erred by denying his motion to suppress because the officers improperly relied on an anonymous tip to stop him. Nicholas argues this stop violated his federal and state constitutional right to be free from unreasonable searches and seizures. Because the officers had corroborated the tip they received from an unknown but named informant with information the officers already knew, the officers' stop did not violate

Nicholas's constitutional right to be free from unreasonable searches and seizures. We hold the trial court did not err by denying Nicholas's motion to suppress.

When reviewing the denial of a suppression motion, we determine whether substantial evidence supports the challenged findings of fact and whether the findings of fact support the conclusions of law. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'" *Garvin*, 166 Wn.2d at 249 (quoting *State v. Reid*, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999)). Unchallenged findings of fact are considered verities on appeal. *State v. Lohr*, 164 Wn. App. 414, 418, 263 P.3d 1287 (2011). We review de novo the trial court's conclusions of law pertaining to the suppression of evidence. *Garvin*, 166 Wn.2d at 249.

Here, Nicholas does not assign error to any of the trial court's findings of fact from the CrR 3.6 hearing. Accordingly, our review is limited to a de novo determination of whether the trial court derived proper conclusions from the unchallenged findings.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution prohibit unreasonable searches and seizures. *State v. Day*, 161 Wn.2d 889, 893, 168 P.3d 1265 (2007). Generally, warrantless searches and seizures are unreasonable and violate the Fourth Amendment and article I, section 7. *Garvin*, 166 Wn.2d at 249. There are "a few 'jealously and carefully drawn exceptions' to the warrant requirement," including *Terry*[3] investigative stops. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002) (quoting *State v. Williams*, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984)). A police officer may conduct a warrantless investigative stop based upon less evidence than is needed to establish probable cause to make an arrest. *State v. Acrey*, 148 Wn.2d 738, 746-47, 64 P.3d 594 (2003).

---

[3] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

But the officer must have "a reasonable suspicion, grounded in specific and articulable facts, that the person stopped has been or is about to be involved in a crime." *Acrey*, 148 Wn.2d at 747. "A reasonable, articulable suspicion means that there 'is a substantial possibility that criminal conduct has occurred or is about to occur.'" *State v. Snapp*, 174 Wn.2d 177, 197-98, 275 P.3d 289 (2012) (quoting *State v. Kennedy*, 107 Wn.2d 1, 6, 726 P.2d 445 (1986)). The officer's suspicion must relate to a particular crime rather than a generalized suspicion that the person detained is "up to no good." *State v. Bliss*, 153 Wn. App. 197, 204, 222 P.3d 107 (2009).

Information supplied by another person may authorize an investigative stop if the informer's tip demonstrates some "'indicia of reliability.'" *State v. Lesnick*, 84 Wn.2d 940, 943, 530 P.2d 243 (1975) (quoting *Adams v. Williams*, 407 U.S. 143, 147, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972)). Our Supreme Court first stated that reliability can be established if (1) the informant was reliable or (2) the officer's corroborative observation suggests either the presence of criminal activity or that the information was obtained in a reliable fashion. *State v. Z.U.E.*, 178 Wn. App. 769, 781, 315 P.3d 1158 (2014) (citing *Lesnick*, 84 Wn.2d at 944). Our Supreme Court subsequently clarified that "'reliability by itself generally does not justify an investigatory detention.' Instead, a reliable informant's tip also must be supported by a 'sufficient factual basis' or 'underlying factual justification' so officers can assess the probable accuracy of the informant's conclusion." *Z.U.E.*, 178 Wn. App. at 781 (quoting *State v. Sieler*, 95 Wn.2d 43, 48, 621 P.2d 1272 (1980)). Thus, "an informant's report can provide reasonable justification for an officer's investigative stop in two situations: (1) when the information available to the officer showed that the informant was reliable or (2) when the officer's observations corroborate either the presence of criminal activity or that the informant's report was obtained in a reliable

fashion." *Z.U.E.*, 178 Wn. App. at 782 (citing *Sieler*, 95 Wn.2d at 47-48; *Lesnick*, 84 Wn.2d at 944).

We determine the propriety of an investigative stop—the reasonableness of the officer's suspicion—based on the "totality of the circumstances." *Snapp*, 174 Wn.2d at 198. The focus is on what the officer knew at the time of the stop. *State v. Lee*, 147 Wn. App. 912, 917, 199 P.3d 445 (2008). A court must base its evaluation of reasonable suspicion on "'commonsense judgments and inferences about human behavior.'" *Lee*, 147 Wn. App. at 917 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)).

Whether a warrantless investigative stop was justified or represents a constitutional violation is a question of law, which we review de novo. *State v. Bailey*, 154 Wn. App. 295, 299, 224 P.3d 852 (2010). The State bears the burden of showing the propriety of an investigative stop. *Acrey*, 148 Wn.2d at 746. If the initial stop was unlawful, the evidence discovered during that stop is not admissible because it is fruit of the poisonous tree. *Kennedy*, 107 Wn.2d at 4.

In this case, considering the totality of the circumstances, the information available to the officer demonstrated the informant's reliability. Thus, the *Terry* stop was proper. The day after the incident at the KC Teriyaki restaurant,

> a person named Matt called 911 to report the following: He had a friend named Nicholas Mayer, who was about 24 or 25 years old; Nicholas had been bragging about committing an armed robbery of a restaurant in Vancouver within the past several days; Nicholas had a "butt load of cash on him," which is not normal for Nicholas; Nicholas had a revolver, which he recently gave to someone; Nicholas was with his girlfriend, named Sarah Baker; Nicholas and Sarah were traveling in a grey Dodge Dakota (pick up truck), and that they had just arrived at a bar at Dollars Corner (in Battleground); and Nicholas was known to have Heroin on him.

CP at 484. Matt did not want to provide his last name, but he did provide his telephone number. Matt, therefore, is classified as an unknown, but named, informant and cannot be characterized as an anonymous informant.

Although Matt did not want to provide any additional personal information, he did provide significant corroborating information regarding the armed robbery of the KC Teriyaki restaurant. The officers were aware that Choe had recently fired Emily for suspected stealing and that she had an older brother who had "a drug problem." 1 RP at 22. Matt told officers that Nicholas was bragging about having recently robbed a Vancouver restaurant and that he frequently had heroin in his possession. Through their independent investigation, the officers knew of Emily's brother, Nicholas. The police considered Nicholas and Emily to be possible suspects. Matt identified the individual he called about as Nicholas Mayer. The officers were aware that the suspects were armed at the time of the robbery. Matt stated that Nicholas had recently given away a gun. The officers were also aware that approximately $800 had been taken from the KC Teriyaki restaurant. Matt stated that Nicholas had a lot of cash on hand, which was unusual. Thus, the information Matt provided corroborated information that the officers already knew. Additionally, Matt provided specific information as to Nicholas's location, whom he was with, and what type of vehicle he was driving. The officers found the pickup where Matt said it could be located. When the officers stopped the grey pickup, there were three occupants, including Nicholas and Baker.

Matt's reliable tip corroborated the information the police already possessed. The officers' stop did not violate Nicholas's constitutional right to be free from unreasonable searches and seizures. We hold the trial court did not err by denying Nicholas's motion to suppress.

11

IV.  NICHOLAS RECEIVED PROPER *MIRANDA* WARNINGS

Nicholas also argues the trial court erred by denying his motion to suppress his statements because the officer's *Miranda* warnings did not properly apprise him of his right to an attorney.  The officer read Nicholas his *Miranda* warnings and then explained the process to obtain an attorney if Nicholas could not afford one.  We hold that the warnings Nicholas received satisfied *Miranda* and the trial court did not err by denying Nicholas's motion to suppress his statements.

When reviewing the denial of a suppression motion, we determine whether substantial evidence supports the challenged findings of fact and whether the findings of fact support the conclusions of law.  *Garvin*, 166 Wn.2d at 249.  "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'"  *Garvin*, 166 Wn.2d at 249 (quoting *Reid*, 98 Wn. App. at 156).  Unchallenged findings of fact are considered verities on appeal.  *Lohr*, 164 Wn. App. at 418.  We review de novo the trial court's conclusions of law pertaining to the suppression of evidence.  *Garvin*, 166 Wn.2d at 249.

The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  Article I, section 9 of the Washington State Constitution states that "[n]o person shall be compelled in any criminal case to give evidence against himself."  The protection provided by the state provision is coextensive with that provided by the Fifth Amendment.  *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008).

Prior to any custodial interrogation, a suspect must be informed that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed

for him prior to any questioning." *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Although no magic words are required, *Miranda* warnings must "clearly inform[]" the individual of his rights. *Miranda*, 384 U.S. at 471. The *Miranda* warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974). "Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably "'conve[y] to [a suspect] his rights as required by *Miranda.*'" *Duckworth v. Eagan*, 492 U.S. 195, 203, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989) (quoting *California v. Prysock*, 453 U.S. 355, 361, 101 S. Ct. 2806, 69 L. Ed. 2d 696 (1981)) (alteration in original).

In *Duckworth*, the officers told the suspect "that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to speak to an attorney before and during questioning, that he had this right to the advice and presence of a lawyer even if [he could] not afford to hire one, and that he had the right to stop answering at any time until [he] talked to a lawyer." 492 U.S. at 203 (alteration in original) (internal quotation marks omitted). The officers then added "that they could not provide respondent with a lawyer, but that one would be appointed if and when you go to court." *Duckworth*, 492 U.S. at 203 (internal quotation marks omitted). The Supreme Court stated that "[w]e think it must be relatively commonplace for a suspect, after receiving *Miranda* warnings, to ask when he will obtain counsel," and held that these initial warnings satisfied *Miranda*. *Duckworth*, 492 U.S. at 204-05.

Here, the officers read Nicholas his *Miranda* warnings, and he waived his rights by stating, "Let's talk." CP at 486. The officers then asked to record Nicholas's interview, to which Nicholas agreed. Once the officers began recording, the following exchange occurred:

DEPUTY DENNISON: Okay. Do I have your permission to record this statement?

MR. MAYER: Yes.

. . . .

DEPUTY DENNISON: Okay. So you (inaudible). I read you your *Miranda* prior to it, but now that we're on—on recording, I'm going to read it to you again, okay? You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right at this time to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand each of these rights as I've explained them to you?

MR. MAYER: Yes. Um, If I wanted an attorney and I can't afford one, what—what would—?

DEPUTY DENNISON: If you wanted an attorney—you know, if you were charged with a crime and arrested, if you wanted an attorney and couldn't afford one, the Court would be willing to appoint you one. Do you want me to go over that with you again?

MR. MAYER: Yeah, but how would that work? Will you be—how it—how I—

DEPUTY DENNISON: You're not under arrest at this point, right?

MR. MAYER: Oh, okay. Okay.

DEPUTY DENNISON: So, if you were, then you would be taken to jail and then you'd go before a judge and then he would ask you whatever at that point, if you were being charged, you would be afforded an attorney if you couldn't hi—you know, if you weren't able to afford one.

MR. MAYER: All right. I understand.

DEPUTY DENNISON: Understand?

MR. MAYER: Yeah.

DEPUTY DENNISON: Okay. So you do understand your rights?

MR. MAYER: Yes.

DEPUTY DENNISON: Keep your rights in mind. Do you want to explain to us or talk to us about—all right, you know, I told you why you're here. There was a robbery at the—at KC Teriyaki and your name has come up. So, keeping your rights in mind, do you want to talk to us about it?

MR. MAYER: Okay.

1 RP at 78-80.

In this case, like in *Duckworth*, Nicholas received *Miranda* warnings and then was also told the process to have an attorney appointed if he could not afford one. Deputy Dennison believed Nicholas's question about an attorney pertained to how he could get an attorney if he could not afford one and that he did not request an attorney at that time. For this reason Deputy Dennison explained the process for having an attorney appointed. As the *Duckworth* Court noted, it is relatively common for a suspect to ask when and how he will obtain counsel if he cannot afford one. 492 U.S. at 204-05. Thus, we hold that the warnings Nicholas received satisfied *Miranda*, and the trial court did not err by denying Nicholas's motion to suppress his statements.

V.    STATE WITNESS'S TESTIMONY REGARDING PLEA BARGAIN DID NOT VIOLATE NICHOLAS'S RIGHT TO HAVE A FAIR AND IMPARTIAL JURY BE THE SOLE JUDGE OF THE FACTS

Nicholas argues the State improperly bolstered Emily's credibility by questioning her about a condition of her plea bargain to testify truthfully. Nicholas argues that by allowing Emily's testimony, the trial court violated his constitutional right to have the jury be the sole judge of the facts and to determine the credibility of witnesses. We hold that the State did not improperly vouch for Emily's credibility by questioning her about the condition of her plea bargain to testify truthfully.

Generally, the State cannot admit evidence that a witness has agreed to testify truthfully in its case in chief. *State v. Ish*, 170 Wn.2d 189, 198, 241 P.3d 389 (2010). On redirect, however, the State may question its witness about an agreement to testify truthfully where the

defense first questioned the witness about the agreement on cross-examination.[4] *Ish*, 170 Wn.2d at 198-99.

Here, a condition of Emily's plea bargain was to testify truthfully in Nicholas's trial. On cross-examination, Nicholas questioned Emily about reasons to doubt her credibility, including that she had received a plea bargain. Nicholas specifically asked Emily, "And the agreement says you're supposed to testify truthfully" and "according to what you told them earlier?" 4B RP at 802-03. On redirect, the State questioned Emily about her plea bargain and her obligation under the plea bargain to testify truthfully.

Because Nicholas questioned Emily about her plea bargain on cross-examination, he opened the door to this subject for redirect. Thus, the trial court did not err by allowing the State to question Emily on redirect about her obligation to testify truthfully. Nicholas was not denied his right to have the jury be the sole judge of witness credibility.

## VI. TRIAL COURT DID NOT ERR BY DENYING NICHOLAS'S MOTION TO CONTINUE

Nicholas argues he was denied effective assistance of counsel because the trial court denied his motion for a continuance of the trial date. We disagree and hold the trial court did not err and that Nicholas was not denied effective assistance of counsel.

---

[4] A defendant may, however, impeach a witness on cross-examination by referencing any agreements or promises made by the State in exchange for the witness's testimony. During such cross-examination, the agreement may be marked as an exhibit, but not necessarily admitted, and relevant portions may be disclosed to the jury. If the agreement contains provisions requiring the witness to give truthful testimony, the State is entitled to point out this fact on redirect if the defendant has previously attacked the witness's credibility.

*Ish*, 170 Wn.2d at 198-99.

A.    MOTION TO CONTINUE

We review a trial court's decision to deny a continuance to determine if the trial court exercised its discretion based on untenable grounds or reasons. *In re Dependency of V.R.R.*, 134 Wn. App. 573, 581, 141 P.3d 85 (2006).    A court considers various factors when it decides a motion to continue, including diligence, due process, the need for an orderly procedure, the possible effect on the trial, and whether the court previously granted continuances. *V.R.R.*, 134 Wn. App. at 581.    To show that the denial of a continuance violated the right to due process, the defendant must show either that he was prejudiced by the denial or that the outcome would have been different if the continuance had been granted. *V.R.R.*, 134 Wn. App. at 581.

Nicholas argues he was prejudiced because his counsel received late DNA evidence and therefore did not have time to employ an expert to evaluate and counter the DNA evidence to prepare a defense.    The record, however, does not support Nicholas's assertion.    Instead, the record demonstrates that Nicholas's counsel was well-prepared and made a strong case for him. Nicholas's counsel extensively cross-examined the State's DNA witness, questioning the DNA witness about, among other things, the DNA locations on a chromosome used to evaluate the DNA evidence; the collection, storage, and testing processes; the precautions taken to avoid contamination; and the statistical analysis performed.    Nicholas fails to show prejudice and does not establish ineffective assistance of counsel.    Thus, his due process argument fails.

Further, Nicholas received the DNA evidence on September 24, but did not move for a continuance until the readiness hearing on October 4, four days before trial was set to begin.    The trial court noted the "somewhat short on provision of this evidence," but that Nicholas did not move to continue until the readiness hearing, "which makes it very short notice to reschedule the entire trial, which does have a number of witnesses." 2 RP at 240.    The trial court also stated

17

that it was familiar with a portion of the evidence from the CrR 3.5 and CrR 3.6 hearings and that the DNA evidence was not a central part of the State's case and was not critical evidence. Thus, considering the importance of evidence, the timeframe of when the evidence was introduced and when Nicholas moved to continue, and that trial was set to begin in only four days, the trial court concluded that a continuance was not justified.

In a similar case, our Supreme Court affirmed the trial court's denial of the defendant's motion to continue to obtain an expert witness. *State v. Downing*, 151 Wn.2d 265, 274, 87 P.3d 1169 (2004). The court held that although the defendant was surprised and did act diligently to secure an expert, a continuance was unnecessary because the expert testimony would not change any material facts. *Downing*, 151 Wn.2d at 274. In so holding, the court stated: "While reasonable minds may differ, we cannot say that the trial court's determination that the maintenance of orderly procedure outweighed the reasons favoring a continuance, such as surprise and due diligence, was manifestly unreasonable." *Downing*, 151 Wn.2d at 274.

Similarly, here, we determine that the DNA evidence was not central to the State's case. Instead, the DNA evidence merely corroborated extensive witness testimony and Nicholas's confession during his interview after arrest. The trial court weighed the timeline of events against the evidence at issue and concluded that a continuance was not necessary. Although reasonable minds may differ, we hold that the trial court's decision was not manifestly unreasonable. We hold the trial court did not err by denying Nicholas's motion to continue.

B.    INEFFECTIVE ASSISTANCE OF COUNSEL

To prove ineffective assistance of counsel, Nicholas must show that counsel's performance was so deficient that it "fell below an objective standard of reasonableness" and that the deficient performance prejudiced him. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). There is a strong presumption that defense counsel's performance was not deficient. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Performance was not deficient if counsel's conduct can be characterized as a legitimate trial strategy. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). To establish prejudice, the defendant must show a reasonable probability that the deficient performance affected the outcome of the trial. *Thomas*, 109 Wn.2d at 226. We review ineffective assistance of counsel claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

Nicholas's counsel was well-prepared and had a significant breadth of knowledge regarding DNA testing and interpretation of the results. Nicholas's counsel extensively cross-examined the State's DNA witness. Thus, Nicholas does not establish deficient performance. Furthermore, as we established above, the trial court's denial of Nicholas motion to continue did not prejudice him. Having failed to meet both prongs of the test, Nicholas does not show that his counsel rendered ineffective assistance.

We affirm Nicholas's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Hunt, J.

Bjorgen, A.C.J.

20